**No. 22-3026**
**(Consolidated with No. 22-3039)**

In the
# United States Court of Appeals for the Third Circuit

KEYSTONE-CONEMAUGH PROJECTS, LLC,
*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
ADMINISTRATOR ENVIRONMENTAL PROTECTION AGENCY,
*Respondents*.

*On Petition for Review of Final Action of the*
*U.S. Environmental Protection Agency*

**PROOF BRIEF OF PETITIONER**
**KEYSTONE-CONEMAUGH PROJECTS, LLC**

Michael H. Winek (PA 69464)
Joseph V. Schaeffer (PA 323256)
BABST, CALLAND, CLEMENTS
AND ZOMNIR, P.C.
603 Stanwix Street, Floor 6
Pittsburgh, PA 15222
(412) 394-5400
mwinek@babstcalland.com
jschaeffer@babstcalland.com

Gina N. Falaschi (DC 198197)
BABST, CALLAND, CLEMENTS
AND ZOMNIR, P.C.
505 9th Street NW, Suite 602
Washington, DC 20004
(202) 853-3455
gfalaschi@babstcalland.com

## CORPORATE DISCLOSURE STATEMENT AND
## STATEMENT OF FINANCIAL INTEREST

Pursuant to Fed. R. App. P. 26.1 and Third Circuit LAR 26.1, Petitioner

Keystone-Conemaugh Projects, LLC makes the following disclosure:

1.    For non-governmental corporate parties please list all parent corporations.

Petitioner's members are Chief Keystone Power, LLC; Chief Keystone Power II, LLC; Chief Conemaugh Power, LLC; Chief Conemaugh Power II, LLC; Keystone Power LLC; Conemaugh Power LLC; Keystone Power Pass-Through Holders LLC; Conemaugh Power Pass-Through Holders LLC; and Montour, LLC.

2.    For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock.

Not applicable.

3.    If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests.

Not applicable.

4.    In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the member of the creditors' committee or the top 20 unsecured creditors; and 3) any entity not named in the caption which is an active participate in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

Not applicable.

January 23, 2023                                        /s/ Joseph V. Schaeffer
                                                       Joseph V. Schaeffer (PA 323256)
                                                       *Counsel for Petitioner*
                                                       *Keystone-Conemaugh Projects, LLC*

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT AND  STATEMENT OF FINANCIAL INTEREST ............................................................................i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ...................................................................v

GLOSSARY........................................................................... viii

INTRODUCTION .............................................................................1

STATUTES.......................................................................................3

STATEMENT OF JURISDICTION.........................................................3

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................4

STATEMENT OF RELATED CASES AND PROCEEDINGS ...............7

STATEMENT OF THE CASE...............................................................8

    A.   The CAA Requires Pennsylvania to Implement RACT for Major Sources of $NO_x$ Emissions. .........................................8

    B.   Keystone and Conemaugh Generating Stations Must Comply with RACT Under the CAA..............................................11

    C.   PADEP Promulgates the First State Plan to Implement RACT for the Facilities and Certain Other Major Sources Within the State.......................................................13

    D.   Sierra Club Petitions for Review of the RACT Provisions for the Facilities in the First State Plan...................................13

    E.   PADEP and EPA Submit Competing State and Federal Proposals to Satisfy the Court's Order Vacating the First State Plan in *Sierra Club*.............................................14

1.    PADEP and EPA First Engage in Cooperative Federalism. .......14

2.    EPA Terminates Cooperation with PADEP and Proposes the Federal Plan for Compliance with *Sierra Club*. ....................17

3.    PADEP and the Facilities Submit Comments Opposing the Proposed Federal Plan as Violating Cooperative Federalism and Setting Arbitrary and Capricious NO$_x$ Limits. ...........................................................................18

4.    PADEP Submits the Second State Plan Pursuant to *Sierra Club*. ...........................................................................21

5.    EPA Promulgates the Federal Plan Over Objections by PADEP and the Facilities. ...........................................22

SUMMARY OF ARGUMENT ...............................................................24

STANDARD OF REVIEW ....................................................................24

ARGUMENT ......................................................................................25

I.    EPA's Promulgation of the Federal Plan Without First Acting on the Second State Plan Submitted by PADEP Was Not Authorized Under CAA § 110(c)(1) and Was Arbitrary and Capricious. ...............................25

A.    EPA Was Not Authorized to Promulgate the Federal Plan Under CAA § 110(c)(1) Without First Acting on the Second State Plan. ...............................................25

B.    EPA Acted Arbitrarily and Capriciously, and Abused its Discretion, Where It Promulgated the Federal Plan Without First Acting on the Second State Plan. ................27

II.    EPA's Promulgation of the Federal Plan Was Arbitrary and Capricious Where the Rolling 30-Day and Daily NO$_x$ Limits are Not Supported by Evidence and Fail to Meet the Standards for RACT. ..........31

A.    The Rolling 30-day NO$_x$ Limits for the Facilities are Not Supported by Evidence. .......................................31

1.    The Rolling 30-day $NO_x$ Limits are Based on Unsupported Assumptions. ..................................................32

    a.    EPA Provided No Evidence to Support its Assumption that Historical Ozone Seasons Represent the Current and Expected Future Performance Conditions of the Facilities' SCR Systems........................32

    b.    EPA Provided No Evidence to Support its Assumption that the Facilities Can Achieve Ozone Season $NO_x$ Limits Outside the Ozone Season. .................34

    c.    EPA Provided No Evidence to Support its Assumption that the Federal Plan Will Not Impair the Facilities' Legal Obligations to PJM. ..................................38

2.    The Rolling 30-day $NO_x$ Limits Fail to Meet the Standards for RACT. ...................................................................41

    a.    EPA Failed to Adequately Account for the Facilities' Change from Baseload to Cycling Units. ...........................42

    b.    EPA Failed to Adequately Account for the Facilities' SCR Systems' Technological Limitations and Accelerated Maintenance Costs............................................45

    c.    EPA Failed to Adequately Account for the Facilities' Legal Obligations to PJM. ...................................48

B.    The Daily $NO_x$ Limits for the Facilities Were Calculated Using the Erroneous Rolling 30-day $NO_x$ Limits..........................................52

III.    KEY-CON Adopts and Incorporates the Briefs Submitted by Homer City and PADEP. ...................................................................52

CONCLUSION....................................................................................53

CERTIFICATE OF COMPLIANCE.........................................................54

CERTIFICATE OF SERVICE ................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bedford Cnty. Mem. Hosp. v. Health & Hum. Servs.*, 769 F.2d 1017 (4th Cir. 1985)................................................................................25

*Bell v. Cheswick Generating Station*, 734 F.3d 188 (3d Cir. 2013) ....... 9, 15, 25, 27

*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020)........ 39, 40

*E.P.A. v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014) ......................29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983) ......................................................................32

*Nat. Res. Def. Council, Inc. v. U.S. Env't Prot. Agency*, 859 F.2d 156 (D.C. Cir. 1988)....................................................................... 25, 51

*Nat'l Parks Conservation Ass'n v. Env't Prot. Agency*, 803 F.3d 151 (3d Cir. 2015)....................................................................................8

*Oklahoma v. U.S. Env't Prot. Agency*, 723 F.3d 1201 (10th Cir. 2013) ................29

*Sierra Club v. Env't Prot. Agency*, 292 F.3d 895 (D.C. Cir. 2002)...........................4

*Sierra Club v. U.S. Env't Prot. Agency*, 972 F.3d 290 (3d Cir. 2020)............. passim

*Tesoro Alaska Petroleum Co. v. Fed. Energy Reg. Comm'n*, 234 F.3d 1286 (D.C. Cir. 2000)........................................................................32

*Texas v. U.S. Env't Prot. Agency*, 829 F.3d 405 (5th Cir. 2016)............................51

*West Virginia v. Env't Prot. Agency*, --- U.S. ---, 142 S. Ct. 2587 (2022)....... 40, 41

## Statutes

42 U.S.C. § 7401 ......................................................................................1

42 U.S.C. § 7408 ......................................................................................9

42 U.S.C. § 7409 ...................................................................................9

42 U.S.C. § 7410 ............................................................................. passim

42 U.S.C. § 7511a ...............................................................................10

42 U.S.C. § 7511c ...............................................................................10

42 U.S.C. § 7607 ............................................................................3, 24

42 U.S.C. § 7661 .................................................................................15

42 U.S.C. § 7661d ..............................................................................15

42 U.S.C. § 7661f ...............................................................................15

## Rules

Fed. R. App. P. 26.1 ............................................................................. i

Fed. R. App. P. 28 ...............................................................................52

Fed. R. App. P. 32 ...............................................................................54

Third Circuit LAR 26.1 ......................................................................... i

## Other Authorities

44 Fed. Reg. 53,760  (Sept. 17, 1979) ...................................................15

57 Fed. Reg. 32,250 (July 21, 1992) ......................................................15

About PJM, PJM, https://www.pjm.com/about-pjm (last accessed Jan. 22, 2023) ...................................................................................................11

Fiscal Year 2016: Justification of Appropriation Estimates for the Committee on Appropriations, U.S. Environmental Protection Agency (Feb. 2015), available at https://bit.ly/3Xotf12 (last accessed Jan. 22, 2023) ...................................................................................................40

Homer City Generation, L.P. v. U.S. Env't Prot. Agency, No. 22-3039 (3d Cir. filed Oct. 28, 2022) ...........................................................................7

*Keystone-Conemaugh Projects, LLC v. Pa. Dep't of Env't. Prot.*, No. 2022-041-B, Pennsylvania Environmental Hearing Board ............................................7

*Keystone-Conemaugh Projects, LLC v. Pa. Dep't of Env't. Prot.*, No. 2022-042-B, Pennsylvania Environmental Hearing Board ............................................7

Notice of Compliance, *Sierra Club v. U.S. Env't Prot. Agency*, No. 19-2562 (3d Cir. filed Aug. 26, 2022) ..............................................................................22

Who We Are, PJM, https://www.pjm.com/about-pjm/who-we-are (last accessed Jan. 22, 2023) ........................................................................................11

# GLOSSARY

| | |
|---|---|
| **CAA** | Clean Air Act, 42 U.S.C § 7401 *et seq.* |
| **CONEMAUGH** | Conemaugh Generating Station |
| **PADEP** | Pennsylvania Department of Environmental Protection |
| **EPA** | U.S. Environmental Protection Agency |
| **EGU** | Electric Generating Unit |
| **FACILITIES** | Conemaugh, Homer City, Keystone, and Montour |
| **FEDERAL PLAN** | Federal Implementation Plan Addressing Reasonably Available Control Technology Requirements for Certain Sources in Pennsylvania, 87 Fed. Reg. 53,381-53,404 (Aug. 31, 2022) |
| **FIP** | A federal implementation plan promulgated under CAA § 110(c)(1) |
| **FIRST STATE PLAN** | Approval and Promulgation of Air Quality Implementation Plans; Pennsylvania; Regulatory Amendments Addressing Reasonably Available Control Technology Requirements Under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards, 84 Fed. Reg. 20,274-20,292 |

(May 9, 2019)

| | |
|---|---|
| **HOMER CITY** | Homer City Generating Station and Homer City Generation, L.P. |
| **KEY-CON** | Keystone-Conemaugh Projects, LLC |
| **KEYSTONE** | Keystone Generating Station |
| **LNB** | Low $NO_x$ Burner |
| **MONTOUR** | Montour Steam Electric Station and Montour, LLC |
| **MMBTU** | Million British Thermal Units |
| **NAAQS** | National Ambient Air Quality Standards |
| **$NO_x$** | Nitrogen Oxides |
| **PJM** | PJM Interconnection, LLC |
| **RACT** | Reasonably Achievable Control Technology |
| **SECOND STATE PLAN** | Case-by-Case SIP Revisions for Conemaugh, Homer City and Keystone submitted May 26, 2022, and Case-by-Case SIP Revision for Montour submitted June 9, 2022 |
| **SCR** | Selective Catalytic Reduction |
| **SIP** | A state implementation plan promulgated under CAA § 110(a) |
| **VOCs** | Volatile Organic Compounds |

## INTRODUCTION

In this Petition for Review, Keystone-Conemaugh Projects, LLC ("KEY-CON"), asks the Court to vacate a federal implementation plan that the U.S. Environmental Protection Agency ("EPA") promulgated to implement Reasonably Achievable Control Technology ("RACT") under the Clean Air Act, 42 U.S.C. § 7401 *et seq.* ("CAA"), for four coal-fired electric generating stations in Pennsylvania, including its Keystone and Conemaugh stations (the "Federal Plan"). (87 Fed. Reg. 53,381-53,404, J.A. ___). Vacatur is required, **first**, because EPA acted arbitrarily, capriciously, and contrary to law when it promulgated the Federal Plan. Section 110(c)(1) of the CAA, 42 U.S.C. § 7410(c)(1), does not authorize promulgation of a federal implementation plan ("FIP") where, as here, EPA failed to act first on a pending state implementation plan ("SIP") revision submitted by the Pennsylvania Department of Environmental Protection ("PADEP"). EPA moreover acted arbitrarily and capriciously, and abused its discretion, when it disregarded the cooperative-federalism approach underlying the CAA and instead usurped from PADEP the responsibility for developing RACT. Vacatur also is required, **second**, because EPA acted arbitrarily and capriciously when it developed the rolling 30-day and daily limits for nitrogen oxides ("$NO_x$") emissions implemented as RACT under the Federal Plan. In the case of the rolling 30-day $NO_x$ limit, EPA relied on assumptions, rather than evidence, in three key

areas: (1) the condition of pollution control systems, (2) the year-round NO$_x$ emissions limits achievable under current and expected future operating conditions, and (3) the conflict between the Federal Plan's NO$_x$ emissions limits and legal obligations to PJM Interconnection, LLC ("PJM"), as the regional transmission organization. EPA's reliance on those assumptions, though arbitrary and capricious in its own right, in turn led EPA to reach arbitrary conclusions in those same three areas and produce an arbitrary and capricious 30-day NO$_x$ emissions limit. And because EPA used the rolling 30-day NO$_x$ limit to calculate the daily limit, that limit is arbitrary and capricious for all the same reasons.

This is the second time that RACT for coal-fired electric generating units ("EGUs") in Pennsylvania has been before the Court. The first time, in *Sierra Club v. U.S. Environmental Protection Agency*, 972 F.3d 290 (3d Cir. 2020), the Court vacated EPA's approval of those provisions in a SIP promulgated by PADEP, finding that EPA had failed to "show its work" and had instead reached conclusions "via *ipse dixit* authority." 972 F.3d at 303 & 305. Regrettably, EPA failed to correct its errors when it promulgated the Federal Plan on remand and, by usurping PADEP's primary role in air pollution prevention and control under the CAA, has in fact compounded them.

For these reasons, as discussed more fully below, the Court should vacate the Federal Plan and remand this matter to EPA.

## STATUTES

Statutes applicable to this appeal are reproduced in relevant part in an addendum to this brief.

## STATEMENT OF JURISDICTION

1.    **Agency Jurisdiction**. Respondents EPA and Michael S. Regan have jurisdiction under Section 110 of the CAA, 42 U.S.C. § 7410, to act upon SIPs and, in limited circumstances, to promulgate FIPs.

2.    **Appellate Jurisdiction**. This is a Petition for Review of the Federal Plan promulgated by EPA under the CAA, entitled Federal Implementation Plan Addressing Reasonably Available Control Technology Requirements for Certain Sources in Pennsylvania, 87 Fed. Reg. 53,381-53,404 (Aug. 31, 2022). The Court has jurisdiction to review the Federal Plan under Section 307 of the CAA, 42 U.S.C. § 7607, because it is final agency action and is locally applicable to four coal-fired electric generating stations located within this circuit: (1) the Keystone Generating Station ("Keystone"), (2) the Conemaugh Generating Station ("Conemaugh"), (3) the Homer City Generating Station ("Homer City"), and (4) the Montour Steam Electric Station ("Montour") (collectively, "Facilities"). (87 Fed. Reg. at 53,381, J.A. ___).

3.    **Timeliness**. A Petition for Review under Section 307 of the CAA, 42 U.S.C. § 7607, must be filed within 60 days from the date that notice of the

challenged action appeared in the Federal Register. Notice of the Federal Plan appeared in the Federal Register on August 31, 2022. (87 Fed. Reg. 53,381-53,404, J.A. ___). KEY-CON timely filed its Petition for Review on October 27, 2022, within the statutory 60-day deadline.

4. **Standing**. KEY-CON has standing because it submitted comments on the Federal Plan as the licensee and permittee of Keystone and Conemaugh. (KEY-CON Comments at 1-15 & Attachments 1-3, J.A. ___ & ___). KEY-CON's standing accordingly "is self-evident," "as is the case usually in review of a rulemaking" where "there should be 'little question that the action or inaction has caused [the petitioner] injury, and that a judgment preventing or requiring the action will redress it.'" *Sierra Club v. Env't Prot. Agency*, 292 F.3d 895, 900 (D.C. Cir. 2002) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992)).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I.  Cooperative federalism is the core principle underpinning the CAA, and, under § 110(c)(1) of the CAA, EPA is authorized to promulgate a FIP only if a SIP has not been submitted, a SIP is administratively incomplete, or a SIP has been disapproved. Must the Court vacate the Federal Plan where:

A.  EPA exceeded its authority under CAA § 110(c)(1) by promulgating the Federal Plan before acting upon the Second State Plan (as defined below)?

**Raised**:         KEY-CON Comments at 5-7, J.A. ___.

**Objected To**:    Not applicable.

**Ruled Upon**:    87 Fed. Reg. at 53,386, J.A. ___.

B.    EPA alternatively acted arbitrarily and capriciously, and abused its discretion, by promulgating the Federal Plan before acting upon the Second State Plan (as defined below)?

        **Raised**:         KEY-CON Comments at 9-11, J.A. ___; Homer City Comments at 2, 5, 8 & 10-11, J.A. ___, ___, ___ & ___; PADEP Comments at 8 & 11, J.A.___ & ___.

        **Objected To**:    Not applicable.

        **Ruled Upon**:    87 Fed. Reg. at 53,386, J.A. ___.

II.    EPA must support its actions with rational conclusions based on record evidence. Must the Court vacate the Federal Plan where:

A.    EPA acted arbitrarily and capriciously by promulgating the Federal Plan based on unsupported assumptions about (1) the condition of pollution control systems, (2) the year-round $NO_x$ emissions limits achievable under current and expected future operating conditions, and (3) the conflict between $NO_x$ emissions limits and legal obligations to PJM as the regional transmission organization?

| | |
|---|---|
| **Raised**: | KEY-CON Comments at 9-13, J.A. ___; PADEP Comments at 6, 8, 11 & 15-16, J.A.___, ___, ___, & ___; Montour Comments at 6, J.A. ___; Class of 85 Comments at 3-4, J.A. ___. |
| **Objected To**: | Not applicable. |
| **Ruled Upon**: | 87 Fed. Reg. at 53,390-53,392 & 53,395-53,399, J.A. ___ & ___. |

B.  EPA acted arbitrarily and capriciously by promulgating the Federal Plan without adequately accounting for (1) the Facilities' evolution from service as baseload units to cycling units, (2) technological and economic limitations on the operation of pollution control systems, and (3) conflicting obligations owed to PJM as the regional transmission organization?

| | |
|---|---|
| **Raised**: | KEY-CON Comments at 9-13, J.A. ___; PADEP Comments at 6, 8, 11 & 15-16, J.A.___, ___, ___, & ___; Montour Comments at 6, J.A. ___; Class of 85 Comments at 3-4, J.A. ___. |
| **Objected To**: | Not applicable. |
| **Ruled Upon**: | 87 Fed. Reg. at 53,390-53,392 & 53,395-53,399, J.A. ___ & ___. |

III.    KEY-CON adopts and incorporates by reference the Statements of Issues in the briefs submitted by Homer City and PADEP.

> **Raised**:        *See* briefs of Homer City and PADEP
>
> **Objected To**:    Not applicable.
>
> **Ruled Upon**:    *See* briefs of Homer City and PADEP

## STATEMENT OF RELATED CASES AND PROCEEDINGS

1.    *Sierra Club v. U.S. Env't Prot. Agency*, 972 F.3d 290 (3d Cir. 2020). The Court vacated EPA's approval of a SIP submitted by PADEP insofar as it established $NO_x$ limits as RACT for certain coal-fired EGUs within the state (the "First State Plan"). *Id.* at 309. The Federal Plan was promulgated in response to this Court's remand order in *Sierra Club* and, excepting EGUs that have ceased operations, applies to the same Facilities. (*See* 87 Fed. Reg. at 53,381).

2.    *Homer City Generation, L.P. v. U.S. Env't Prot. Agency*, No. 22-3039 (3d Cir. filed Oct. 28, 2022). This Petition for Review of the Federal Plan was filed by Homer City and has been consolidated with the above-captioned Petition for Review.

3.    *Keystone-Conemaugh Projects, LLC v. Pa. Dep't of Env't. Prot.*, No. 2022-041-B, Pennsylvania Environmental Hearing Board, and *Keystone-Conemaugh Projects, LLC v. Pa. Dep't of Env't. Prot.*, No. 2022-042-B, Pennsylvania Environmental Hearing Board. In June 2022, KEY-CON filed

appeals with the Pennsylvania Environmental Hearing Board ("EHB") from the modified Title V operating permits that PADEP issued for Keystone and Conemaugh. The modified Title V operating permits impose revised $NO_x$ emission limits and other conditions on Keystone's and Conemaugh's EGUs to satisfy RACT requirements. Though parts of the modified Title V operating permits have been stayed at times by the EHB, those permits are now in effect except for a single provision related to selective catalytic reduction maintenance plans.

4.      KEY-CON's Petition for Reconsideration and Stay of Final Action, U.S. Environmental Protection Agency (filed Oct. 27, 2022). (KEY-CON Reconsideration Petition, J.A. ___). EPA has not acted on KEY-CON's petition as of the date of this filing.

5.      Homer City's Petition for Partial Reconsideration and Stay, U.S. Environmental Protection Agency (filed Oct. 19, 2022). (Homer City Reconsideration Petition, J.A. ___). EPA has not acted on Homer City's petition as of the date of this filing.

## STATEMENT OF THE CASE

### A.      The CAA Requires Pennsylvania to Implement RACT for Major Sources of $NO_x$ Emissions.

Congress enacted the CAA in 1970 to address increasing air pollution from industrialization and the resulting effects on public health and welfare. *Nat'l Parks Conservation Ass'n v. Env't Prot. Agency*, 803 F.3d 151, 153 (3d Cir. 2015).

Cooperative federalism is the "core principle" of the CAA. *Sierra Club*, 972 F.3d at 293. The CAA thus tasks EPA with the initial responsibility for establishing National Ambient Air Quality Standards ("NAAQS") but gives the states the responsibility and discretion for implementing them. *Id.*[1] Under this framework, "air pollution prevention and control is the primary responsibility of individual states and local governments." *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013).

One of the air pollutants for which EPA has set NAAQS is ozone, which is created by a chemical reaction between $NO_x$ and volatile organic compounds ("VOCs") emitted from certain industrial and mobile sources. (87 Fed. Reg. 31,798-31,799, J.A. ___); *see also Sierra Club*, 972 F.3d at 293-94. If any area within a state is classified as moderate or higher for non-attainment under the ozone NAAQS, or is within an ozone transport region, the state must develop RACT requirements for major stationary sources of $NO_x$ and include them in a proposed SIP submitted to EPA.[2] (87 Fed. Reg. at 31,799-31,800, J.A. ___); *see*

---

[1] Section 108 of the CAA directs EPA to list and develop criteria for air pollutants. 42 U.S.C. § 7408. Section 109 of the CAA directs EPA to set NAAQS for the air pollutants listed under § 108. 42 U.S.C. § 7409. Section 110 of the CAA directs each state to submit to EPA a plan for implementing NAAQS. 42 U.S.C. § 7410.

[2] Sections 182(b), -(c), -(d), and -(e) of the CAA impose a RACT requirement for major sources of VOCs in moderate, severe, serious, and extreme non-attainment
(continued)

*also* 42 U.S.C. §§ 7511a & 7511c. Pennsylvania is required to implement RACT for major sources of $NO_x$ because certain regions within the state are in nonattainment for ozone and because the state is in an ozone transport region. (87 Fed. Reg. at 31,799-31,800, J.A. ___); *see also* 42 U.S.C. § 7511c(a).

Though requiring the states to implement RACT for major sources of $NO_x$, the CAA provides no definition of the term. EPA has consistently interpreted RACT, however, to mean "the lowest emission limit that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility." (87 Fed. Reg. at 53,382, J.A. ___); *see also Sierra Club*, 972 F.3d at 294. Technological feasibility must consider "the source's process and operating procedures, raw materials, physical plant layout, and any other environmental impacts such as water pollution, waste disposal, and energy requirements." *Sierra Club*, 972 F.3d at 295 (quoting 57 Fed. Reg. 18,070, 18,073 (Apr. 28, 1992)). Economic feasibility must consider "the costs of reducing emissions and the difference in costs between the particular source and other similar sources that have implemented emission reduction." *Id.* (same).

---

areas, respectively. 42 U.S.C. § 7511a(b)-(e). Section 182(f) of the CAA makes the RACT requirements for VOCs applicable to $NO_x$ as well. 42 U.S.C. § 7511a(f).

**B.    Keystone and Conemaugh Generating Stations Must Comply with RACT Under the CAA.**

KEY-CON is the licensee and CAA Title V permittee for Keystone and Conemaugh, which are located to the northeast of Pittsburgh in Armstrong County and Indiana County, respectively. (KEY-CON Comments at 1 & Attachment 1, J.A. __ & ___). Keystone and Conemaugh are each staffed by approximately 130 full-time employees and 85 daily contractors. (KEY-CON Comments at 1, J.A. __).

Dispatch of the EGUs at Keystone and Conemaugh is controlled by PJM, a regional transmission organization that provides wholesale electricity in 13 states, including Pennsylvania.[3] (87 Fed. Reg. at 53,382, J.A. ___). For many years PJM dispatched the EGUs consistent with their design as baseload units, meaning that they maintained boiler operations at design capacity on a near-constant basis. (87 Fed. Reg. at 53,382, J.A. ____; KEY-CON Comments at 8-9, J.A. ___). In recent years, however, several factors have led PJM to dispatch the facilities as cycling

---

[3] PJM is regulated by the Federal Energy Regulatory Commission and coordinates the movement of wholesale electricity in all or parts of 13 states, including Pennsylvania. Who We Are, PJM, https://www.pjm.com/about-pjm/who-we-are (last accessed Jan. 22, 2023) & About PJM, PJM, https://www.pjm.com/about-pjm (last accessed Jan. 22, 2023). PJM's mission is to ensure the safety, reliability, and security of the bulk electric power system. About PJM, *supra*.

units that dispatch episodically and at lower electrical loads. (KEY-CON Comments at 8-9, J.A. ___).

Whether operating as baseload or cycling units, Keystone and Conemaugh are major sources of $NO_x$ that must meet RACT requirements under the CAA. These facilities control their $NO_x$ emissions primarily through low $NO_x$ burners ("LNBs") and selective catalytic reduction ("SCR") systems. (KEY-CON Comments at 1 & 10, J.A. ___ & ___). SCRs were installed at Keystone in 2003 and at Conemaugh in 2014 as discretionary pollution control devices as part of KEY-CON's strategy for complying with $NO_x$ allowance trading programs and the mercury air toxics standards rule. (*Id.* at 10, J.A. ___).

SCR systems like those installed at Keystone and Conemaugh typically consist of stationary catalyst beds and an ammonia reagent. (Homer City Comments Exhibit A at 1, J.A. ___). Within the appropriate temperature range, the ammonia reagent is injected into the flue gas, where it diffuses into the catalyst's pore structure and adsorbs across an active catalyst site. (*Id.*). As $NO_x$ then crosses the catalyst, it undergoes a chemical reaction with the adsorbed ammonia, and, under sufficiently high temperatures, is converted to nitrogen and water vapor that are released as part of the emissions stream. (*Id.* at 1-2, J.A. ___).

**C.    PADEP Promulgates the First State Plan to Implement RACT for the Facilities and Certain Other Major Sources Within the State.**

In 2016, PADEP submitted to EPA the First State Plan to implement RACT under the 1997 and 2008 ozone NAAQS for certain major sources within the state, including the Facilities. (87 Fed. Reg. at 31,800, J.A. ___). Under the RACT implemented in the First State Plan, the Facilities were subject to a presumptive $NO_x$ limit of 0.12 pounds per million British thermal units ("lbs/MMBtu") when SCR inlet temperatures were 600 degrees or greater and a less restrictive $NO_x$ limit when SCR inlet temperatures were lower. (87 Fed. Reg. at 31,800-31,801, J.A. ___). EPA approved the portions of the First State Plan applicable to the Facilities in 2019, and Sierra Club then petitioned the Court for review of that approval.[4] (87 Fed. Reg. at 31,800, J.A. ___); *see also Sierra Club*, 972 F.3d at 293.

**D.    Sierra Club Petitions for Review of the RACT Provisions for the Facilities in the First State Plan.**

In August 2020, the Court issued an opinion granting Sierra Club's petition for review and vacating EPA's approval of the RACT provisions for the Facilities in the First State Plan. The Court rejected the 0.12 lbs/MMBtu presumptive $NO_x$ limit, finding that EPA was "able neither to offer a reasonable justification for

---

[4] The First State Plan also included RACT requirements for the Bruce Mansfield Power Plant and the Cheswick Generating Station, both of which have ceased operations. (87 Fed. Reg. at 53,381, J.A. ___).

failing to require a stricter standard, nor to justify the standard it endorsed." *Sierra Club*, 972 F.3d at 301-02. The Court also rejected the 600-degree threshold for applying the stricter 0.12 lbs/MMBtu $NO_x$ limit, finding there, too, that EPA had failed to offer a rational explanation supported by record evidence and, instead, had "adopt[ed] it via *ipse dixit* authority." *Id.* at 305. Finally, the Court agreed with Sierra Club that the First State Plan's lack of tangible reporting requirements made compliance monitoring infeasible. *Id.* at 307-09. The Court accordingly directed EPA on remand to "either approve a revised, compliant SIP within two years or formulate a new federal implementation plan." *Id.* at 309.

**E.    PADEP and EPA Submit Competing State and Federal Proposals to Satisfy the Court's Order Vacating the First State Plan in *Sierra Club*.**

**1.    PADEP and EPA First Engage in Cooperative Federalism.**

EPA did not take official action in response to *Sierra Club* until more than a year later, when it proposed disapproving the provisions of the First State Plan that had been vacated by the Court. (86 Fed. Reg. at 51,315-51,318, J.A. ___). EPA explained that partial disapproval was necessary "in part to ensure [EPA has] the authority to promulgate a FIP if Pennsylvania does not submit a timely or approvable SIP revision addressing [the Court's] decision." (86 Fed. Reg. at 51,316, J.A. ___). EPA underscored, however, that "EPA has been and will

continue to work with PADEP to address revised RACT determinations during the state's development of the SIP revision in response to the court decision." (*Id.*).

PADEP meanwhile had started preparing a revised SIP for the Facilities in accordance with longstanding EPA policy requiring consideration of "the technological and economic circumstances **of the individual source**." 44 Fed. Reg. 53,760, 53,762 (Sept. 17, 1979) (emphasis added). In November 2020, PADEP thus requested that the Facilities submit case-by-case $NO_x$ RACT analyses, as allowed under PADEP's existing regulations. (KEY-CON Comments Attachment 1, J.A. ___; 87 Fed. Reg. at 53,381, J.A. ___). The requirements derived from the case-by-case $NO_x$ RACT analyses would then be captured in modified Title V permits to support the SIP revision required by *Sierra Club*.[5] (PADEP Comments Enclosure 1 at 1, J.A. ___).

When PADEP submitted the final-form Title V modification for Keystone to EPA for review in January 2022, it included case-by-case RACT. (PADEP Comments at 7 & Enclosure 1 at 1, J.A. ___ & ___; KEY-CON Comments at 2-3,

---

[5] The Title V program, codified at 42 U.S.C. § 7661 to 42 U.S.C. § 7661f, is intended to serve as a "source-specific bible" that compiles all CAA requirements for a particular facility into a single permit. *See Bell*, 734 F.3d at 190. Any requirements applicable to a facility under a SIP are included in the CAA requirements incorporated into the Title V permit. 57 Fed. Reg. 32,250, 32,258 (July 21, 1992). EPA must review and approve Title V permits. 42 U.S.C. § 7661d.

9 & 13, J.A. ___, ___ & ___). PADEP had invested more than 1,000 staff hours and engaged with EPA in bi-weekly meetings for nearly a year. (PADEP Comments at 7 & Enclosure 1 at 1, J.A. ___ & ___). At EPA's request, PADEP did not submit the remaining Title V permit modifications at that time so that any feedback on the Keystone modification could be incorporated before it submitted the other three. (PADEP Comments Enclosure 1 at 1-2, J.A. ___). The agencies instead agreed to engage in substantive discussions on Keystone's Title V permit modification during EPA's 45-day comment window. (*Id.* at 1, J.A. ___).

EPA's cooperation with PADEP in response to *Sierra Club* ceased in February 2022, after PADEP submitted the Title V permit modification for Keystone to EPA for review. (*Id.*). Rather than engage in substantive discussions and provide feedback during its comment window, EPA instead deferred its response until the last day to submit comments. (*Id.*). EPA then limited its response to characterizing the Keystone Title V modification as insufficient to support the SIP revision required by *Sierra Club*. (*Id.* at 1-2, J.A. ___). Citing "resource allocation" issues, EPA refused to offer any additional feedback. (*Id.* at 2, J.A. ___). Although six months remained for submission of a SIP revision under *Sierra Club*, EPA also informed PADEP that it would not process **any** state revision and would proceed with the issuance of a FIP instead. (*Id.*). KEY-CON was unaware of these issues until EPA proposed the Federal Plan discussed below.

### 2.    EPA Terminates Cooperation with PADEP and Proposes the Federal Plan for Compliance with *Sierra Club*.

True to its promise to PADEP, in May 2022, EPA proposed the Federal Plan to implement source-specific RACT for the Facilities in the form of two $NO_x$ limits: (1) a rolling 30-day average emissions rate expressed in pounds per Million British Thermal Units and (2) a daily mass limit expressed in pounds. (87 Fed. Reg. 31,798-31,814, J.A. ___). EPA was candid that it lacked significant information when developing the proposed Federal Plan. It noted, for instance, that it "[did] not have … complete information on all the effects of varying temperature levels on SCR operation and emissions control performance." (87 Fed. Reg. at 31,804, J.A. ___). It also identified not having "reliable, updated information beyond what was presented in the 2015 Good Neighbor Plan on how VOM [(variable operation and maintenance)] costs may have risen." (87 Fed. Reg. at 31,809, J.A. ___).

In the absence of this data, EPA nonetheless calculated the 30-day limits using two key assumptions:

> **First**, that the Facilities' performance controlling $NO_x$ emissions during the May 1 to September 30 ozone season was representative of their ability to control $NO_x$ emissions during the remainder of the year, (87 Fed. Reg. at 31,802, J.A. ____); and

> **Second**, that any degradation in the ability of the Facilities' SCR systems to control $NO_x$ emissions was represented by their third-best ozone-season performance (87 Fed. Reg. at 31,805 & 31,807, J.A. ___ & ___).

- 17 -

EPA then calculated the daily $NO_x$ limits, expressed in mass emissions, by multiplying the source-specific rolling 30-day limit by the maximum hourly heat input rate and then multiplying the product by 24. (87 Fed. Reg. at 31,806, J.A. ___). For Keystone Unit 1, for instance, EPA took the proposed facility-wide rolling 30-day limit of 0.074 lbs/MMBtu and the maximum hourly heat input rate of 8,717 MMBtu/hr to set a daily $NO_x$ limit of 15,481 lbs per unit (i.e., 0.074 x 8,717 x 24). (87 Fed. Reg. at 31,806-31,807, J.A. ___).

Though EPA noted that PADEP had developed its own source-specific RACT for the Facilities in Title V permit modifications, with the intention of incorporating those standards into a SIP revision, its preamble to the proposed Federal Plan pleaded uncertainty about the status of PADEP's efforts: "At this time, it is not known when, or if, PADEP will submit these permits to EPA as SIP revisions to address the Court's decision [in *Sierra Club*]." (87 Fed. Reg. at 31,802, J.A. ___).

> ### 3. PADEP and the Facilities Submit Comments Opposing the Proposed Federal Plan as Violating Cooperative Federalism and Setting Arbitrary and Capricious $NO_x$ Limits.

A variety of stakeholders submitted comments on the proposed Federal Plan, including PADEP and the Facilities. A threshold concern for PADEP and the Facilities was that EPA would be usurping Pennsylvania's regulatory primacy under the CAA. PADEP contrasted the 1,000 staff hours that it had invested in

developing a SIP revision, as well as its significant efforts to engage with EPA in the process, with the absence of corresponding outreach by EPA to fill gaps in its analysis. (PADEP Comments at 2, 7-8, 13, 17-18 & Enclosure 1, J.A.___, ___, ___, ___ & ___). PADEP also reminded EPA that it had delayed submitting its SIP revisions at EPA's request, with the understanding that EPA would work with PADEP to address any concerns. (PADEP Comments at 7-8 & Enclosure 1, J.A. ___ & ___). The Facilities, for their part, emphasized that EPA's FIP-first approach violated the cooperative-federalism structure underpinning the CAA. (KEY-CON Comments at 5-7, J.A. ___).

Commenters also criticized the appropriateness and accuracy of the assumptions underlying EPA's selection of the third-best ozone season as representative of current RACT for $NO_x$ emissions.

> **Equipment Condition.** PADEP noted that EPA had shown "no evidence to demonstrate that the third-best year bears any connection to age or condition of equipment." (PADEP Comments at 11, J.A. ___). EPA admitted to lacking important data, yet made no outreach to PADEP or the Facilities and thus failed to consider essential and readily obtainable information when preparing the Federal Plan. (PADEP Comments at 8, J.A. ___).
>
> **Ozone-season Data.** PADEP and the Facilities identified several reasons why ozone-season data is not representative of year-round $NO_x$ control performance, including significant operational changes since the baseline ozone seasons selected by EPA and climatic effects from lower ambient temperatures in winter months (which KEY-CON discussed with EPA during a December 2020 conference call). (PADEP Comments at 11, J.A. ___; KEY-CON Comments at 9-11, J.A. ___; Homer City Comments at 2, 5, 8 &

10-11, J.A. ___, ___, ___ & ___).

**PJM.** Commenters pointed out that EPA did not account at all for the control exercised by PJM over dispatch and operations. (PADEP Comments at 6 & 15-16, J.A. ___ & ___; KEY-CON Comments at 12-13, J.A. ___; Montour Comments at 6, J.A. ___; Class of 85 Comments at 3-4, J.A. ___).

Several commenters also expressed concerns with the method and conclusions that EPA employed in its calculation of RACT.

**Historical Averages**. PADEP criticized EPA for calculating the rolling 30-day $NO_x$ limit using a weighted average of the Facilities' performance with and without SCR controls. (PADEP Comments at 5, J.A. ___). PADEP commented that this approach was practically indistinguishable from the averaging approach that the Court rejected in *Sierra Club* and adopted an arbitrary $NO_x$ emissions rate of 0.2 lbs/MMBtu as a proxy for SCR equipment usage. (PADEP Comments at 5 & 9, J.A. ___ & ___).

**Market and Regulatory Effects**. Commenters also noted that the proposed $NO_x$ limits did not account for market and regulatory effects that made the emissions data on which they were based unrepresentative of the Facilities' current and projected capabilities. (PADEP Comments at 9-10, J.A. ___; KEY-CON Comments at 1 & 7-8, J.A. ___ & ___; Montour Comments at 2 & 6, J.A. ___ & ___; Homer City Comments at 2 & 11, J.A. ___ & ___; Class of 85 Comments at 1 & 3, J.A. ___ & ___). By including years in which the Facilities operated as baseload units, EPA minimized the impact on $NO_x$ emissions from the more frequent startup events and lower electrical loads that characterize the Facilities' current and projected service as cycling units. (PADEP Comments at 10, J.A. ___; KEY-CON Comments at 8, J.A. ___; Montour Comments at 1-2, J.A. ___). EPA also did not account for intervening changes in compliance obligations, such as mercury air toxics regulations that affect SCR operating parameters. (PADEP Comments at 9, J.A. ___; KEY-CON Comments at 1 & 7, J.A. ___ & ___). And EPA simply did not consider that PJM dictates electrical loads and operations. (PADEP Comments at 6 & 15-16, J.A. ___ & ___; KEY-CON Comments at

12-13, J.A. ___; Montour Comments at 1-2 & 6; J.A. ___ & ___; Homer City Comments at 7, J.A. ___; Class of 85 Comments at 3-4, J.A. ___).

**Technological Feasibility**. Commenters further noted that, even if the proposed $NO_x$ limits were achievable under current market and regulatory conditions, the measures needed to achieve them would negatively affect the SCR systems. Operating SCR systems below their design operating temperature or increasing ammonia injection rates increases the potential for unreacted ammonia to be present in the flue gas stream (i.e., "ammonia slip"). (KEY-CON Comments at 7 & 10, J.A. ___ & ___; Homer City Comments at 8 & Exhibit A at 2, J.A. ___ & ___). Ammonia slip in turn leads to ammonium bisulfate forming and accumulating on catalyst surfaces and downstream air heaters, inhibiting performance and requiring accelerated maintenance. (KEY-CON Comments at 7 & 10, J.A. ___ & ___; Homer City Comments at 8 & Exhibit A at 2, J.A. ___ & ___).

**Economic Feasibility**. The Facilities emphasized the significant economic consequences that would result from the proposed Federal Plan. In addition to the **direct** increased costs that the Facilities would incur for accelerated maintenance needed to address ammonia slip and fouling, they would also incur significant **indirect** costs from forfeited dispatch opportunities. (KEY-CON Comments at 12-13, J.A. ___; Homer City Comments at 7, J.A. ___; Montour Comments at 6, J.A. ___).

### 4.    **PADEP Submits the Second State Plan Pursuant to *Sierra Club*.**

While the public comment period for the proposed Federal Plan was underway, PADEP submitted to EPA proposed SIP revisions with case-by-case RACT determinations for the Facilities (collectively, "Second State Plan"). (87 Fed. Reg. at 53,382, J.A. ___). The proposed SIP revisions for Keystone,

Conemaugh, and Homer City were submitted in late-May 2022 and the proposed SIP revision for Montour was submitted in early June 2022. (*Id.*).

**5.    EPA Promulgates the Federal Plan Over Objections by PADEP and the Facilities.**

EPA finalized its partial disapproval of the First State Plan in mid-August 2022. (87 Fed. Reg. 50,257-50,259, J.A. ___). Then, on the eve of the compliance deadline under *Sierra Club*, EPA filed the Federal Plan with the Court ahead of its publication in the Federal Register on August 31, 2022 (87 Fed. Reg. at 53,381-53,404, J.A. ___); *see also* Notice of Compliance, *Sierra Club v. U.S. Env't Prot. Agency*, No. 19-2562 (3d Cir. filed Aug. 26, 2022). In the preamble to the Federal Plan, EPA continued to acknowledge significant gaps in its record. Yet EPA maintained it had "no reason to believe that achieving the same [$NO_x$ emissions] performance outside the ozone season would be technologically or economically infeasible." (87 Fed. Reg. at 53,382, J.A. ___). EPA averred that it "did not identify, and commenters did not provide, a compelling reason to exclude any of the years [considered for historical $NO_x$ emissions performance]." (87 Fed. Reg. at 53,384, J.A. ___). Where the Facilities employed control technologies in addition to their SCR systems, EPA "assumed that the sources continued to operate these other technologies without change" and "did not evaluate these technologies in the context of [its] RACT analysis." (87 Fed. Reg. at 53,392, J.A. ___). And it further "believe[d] it is entirely reasonable to assume" that the Facilities and PJM could

accommodate their operational needs to the $NO_x$ emissions limits in the Federal Plan. (87 Fed. Reg. at 53,398, J.A. ___). Although commenters had requested EPA to extend the comment period, in part to fill these gaps in the analysis, EPA refused. (EPA-R03-OAR-2022-0347-0068, J.A. ___)

With three significant exceptions, EPA in fact made only minor changes to the final Federal Plan in response to the comments submitted on the proposal.

> **First,** EPA agreed that the rolling 30-day $NO_x$ limits should be based on the weighted average of all EGUs at a Facility, rather than a Facility's best-performing EGU. (87 Fed. Reg. at 53,388 & 53,399-53,400, J.A. ___ & ___).

> **Second**, agreeing that Conemaugh had the newest SCR system and should be able to meet stricter limits, EPA updated its calculation of the rolling 30-day $NO_x$ limit for that facility to use the second-best rate, with the effect of lowering that limit from 0.091 lbs/MMBtu to 0.072 lbs/MMBtu. (*Compare* 87 Fed. Reg. at 53,393 & 53,399, J.A. ___ & ___ *with* 87 Fed. Reg. 31,806, J.A. ___).

> And, **third**, agreeing with a technical analysis submitted by Montour, EPA increased the rolling 30-day $NO_x$ limits for that facility from 0.069 lbs/MMBtu to 0.102 lbs/MMBtu. (*Compare* 87 Fed. Reg. at 53,397 & 53,399, J.A. ___ & ___, *with* 87 Fed. Reg. at 31,806, J.A. ___).

EPA also removed the proposed $NO_x$ limits for Cheswick from the Federal Plan after confirming it had ceased operations. (87 Fed. Reg. at 53,381, J.A. ___). In an aside, EPA noted that it had "not fully evaluated" the Second State Plan proposed by PADEP and was not addressing that proposal as part of its action. (Fed. Reg. at 53,382, J.A. ___).

KEY-CON filed a timely petition for review of the Federal Plan with the Court, which consolidated it with a related petition for review filed by Homer City.

## SUMMARY OF ARGUMENT

EPA promulgated the Federal Plan in an effort to satisfy the Court's directive in *Sierra Club* to implement RACT for the Facilities. In doing so, however, EPA usurped PADEP's primary responsibility under the CAA for air pollution prevention and control in a way that is both contrary to the statutory prerequisites for promulgating a FIP under CAA § 110(c)(1) and arbitrary and capricious. The Federal Plan moreover suffers from the same errors that the Court identified in *Sierra Club* and others besides. EPA arbitrarily and capriciously abdicated its duty to develop record evidence in favor of unsupported assumptions about the Facilities' pollution control capabilities and other legal obligations. Consequently, EPA also arbitrarily and capriciously failed to properly account for the Facilities' status as cycling units, constraints on pollution control equipment, and other legal obligations. For any one or all of these reasons, the Court should vacate the Federal Plan.

## STANDARD OF REVIEW

The Court should vacate the Federal Plan if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A). EPA cannot reach a predetermined conclusion supported only with

"vague allusions to its own expertise." *Sierra Club*, 972 F.3d at 298. Nor can EPA

reach "a decision that is so implausible that it cannot be ascribed to a difference in

view." *Bedford Cnty. Mem. Hosp. v. Health & Hum. Servs.*, 769 F.2d 1017, 1022

(4th Cir. 1985). EPA rather must "support its conclusion with demonstrable

reasoning based on facts in the record," *Sierra Club*, 972 F.3d at 298, and "come to

grips with the obvious ramifications of its approach and address them in a reasoned

fashion," *Nat. Res. Def. Council, Inc. v. U.S. Env't Prot. Agency*, 859 F.2d 156,

209-10 (D.C. Cir. 1988). If EPA ignores critical aspects of the problem, offers only

conclusory statements unsupported by rational basis, or offers no data at all, then

EPA has failed to meet its burden of reasoned decision-making and this Court

should vacate the Federal Plan. *Sierra Club*, 972 F.3d at 298.

## ARGUMENT

I.  **EPA's Promulgation of the Federal Plan Without First Acting on the Second State Plan Submitted by PADEP Was Not Authorized Under CAA § 110(c)(1) and Was Arbitrary and Capricious.**

EPA acted both contrary to law and arbitrarily and capriciously where it

promulgated the Federal Plan without first acting on the pending Second State

Plan.

### A.  **EPA Was Not Authorized to Promulgate the Federal Plan Under CAA § 110(c)(1) Without First Acting on the Second State Plan.**

Under the CAA, "air pollution prevention and control is the primary

responsibility of individual states and local governments." *Bell*, 734 F.3d at 190.

The CAA thus makes the **states** primarily responsible for preparing and submitting to EPA a plan for implementing NAAQS. 42 U.S.C. § 7410. Under § 110(c)(1) of the CAA, EPA is authorized to usurp the states' role and promulgate a FIP in only two circumstances:

> (A) [EPA] finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A), or
>
> (B) [EPA] disapproves a State implementation plan submission in whole or in part, unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

42 U.S.C. § 7410(c)(1).

Here, subsection (A) did not authorize EPA to promulgate the Federal Plan because PADEP had in fact submitted a plan (i.e., the Second State Plan) and EPA made no finding that it failed to satisfy the minimum statutory criteria. 42 U.SC. § 7410(c)(1)(A). And Subsection (B) did not authorize EPA to promulgate the Federal Plan because EPA had not taken any action to disapprove the pending Second State Plan proposed by PADEP. 42 U.S.C. § 7410(c)(1)(B). The preamble to the notice promulgating the Federal Plan is clear: "EPA has not yet fully evaluated [the Second State Plan] and they are outside the scope of this action." (87 Fed. Reg. at 53,382, J.A. ___). EPA thus acted contrary to CAA § 110(c)(1)

when it promulgated the Federal Plan without first taking action to disapprove the pending Second State Plan.

**B.    EPA Acted Arbitrarily and Capriciously, and Abused its Discretion, Where It Promulgated the Federal Plan Without First Acting on the Second State Plan.**

Even if the Court determines that CAA § 110(c)(1) authorized EPA to promulgate the Federal Plan without first acting on the pending Second State Plan, it was still arbitrary, capricious, and an abuse of discretion for EPA to have done so in this case. Cooperative federalism is the "core principle" under the CAA, and "the individual states are afforded discretion in the planning and implementation of plans to achieve the EPA's goals for reduction in air pollutants." *Sierra Club*, 972 F.3d at 293. The CAA makes "air pollution prevention and control … the primary responsibility of individual states and local governments." *Bell*, 734 F.3d at 190.

Comments submitted by PADEP highlighted the significant efforts that it made after *Sierra Club* to work with the Facilities and EPA on a second plan implementing RACT:

- Substantial engagement with the Facilities to obtain facility-specific information, (PADEP Comments at 8, J.A. ___);

- Twenty meetings with EPA, (PADEP Comments at 7 & Enclosure 1, J.A. ___ & ___);

- More than 1,000 staff hours invested in preparing the Title V permit modifications, (*Id.*);

- Submission of the Title V permit modifications for public notice

and comment, (87 Fed. Reg. at 53,381-53,382, J.A. ___);

- Deferral of Title V permit modifications to EPA, at its request, (PADEP Comments Enclosure 1, J.A. ___); and

- Preparation and submission of the Second State Plan, (87 Fed. Reg. at 53,382, J.A. ___).

The proposed partial disapproval that EPA promogulated for the First State Plan likewise indicated an initially cooperative relationship, stating that "EPA has been and will continue to work with PADEP to address revised RACT determinations during the state's development of the SIP revision in response to the court decision." (86 Fed. Reg. at 51,316, J.A. ___).

In early 2022, however, EPA terminated further cooperation with PADEP and reneged on its agreement to work cooperatively toward the submission of a SIP revision in compliance with *Sierra Club*. (PADEP Comments at 7-8 & Enclosure 1-2 at 1, J.A. ___ & ___). EPA instead announced that it would not process **any** SIP revisions submitted by PADEP but would proceed with its own FIP. (PADEP Comments Enclosure 1 at 1-2, J.A. ___).

EPA did not address its abandonment of cooperative federalism other than to claim that its disapproval of the First State Plan gave it the right to promulgate the Federal Plan regardless of the pending Second State Plan. (87 Fed. Reg. at 53,386, J.A. ___). But neither case that EPA cited in the preamble to the Federal Plan supports its action here. (*See id.*). Both *Environmental Protection Agency v. EME*

*Homer City Generation, L.P.*, 572 U.S. 489 (2014), and *Oklahoma v. U.S. Environmental Protection Agency*, 723 F.3d 1201 (10th Cir. 2013), considered circumstances where the state(s) had failed to promulgate a plan within the statutory window under the CAA. Here, however, PADEP had already promulgated the First State Plan and, after that plan was vacated in *Sierra Club*, worked actively (and in communication with EPA) to prepare and submit the Second State Plan. (PADEP Comments at 7 & Enclosure 1, J.A. ___ & ___). Moreover, although *Oklahoma* did consider the submission of a competing SIP where a FIP had already been proposed, it also involved a factual circumstance missing here: formal EPA action disapproving the SIP in connection with promulgation of the FIP. 723 F.3d at 1223. And in *EME Homer City* there was simply no pending SIP to address. 572 U.S. at 508.

Further distinguishing this case from *EME Homer City* and *Oklahoma* are the Title V permit modifications that PADEP prepared as the first step in implementing the new RACT standards for the Facilities. (PADEP Comments Enclosure 1 at 1, J.A. ___). Not only did EPA work with PADEP on the modifications, they have now been issued in Title V permits. (PADEP Comments

Enclosure 1, J.A. ___; 87 Fed. Reg. at 53,382, J.A. ___).[6] By promulgating the Federal Plan with different RACT standards than those included in the Facilities' Title V permits, EPA has arbitrarily and capriciously subjected the Facilities to competing compliance obligations.

Finally, EPA stated that mandatory sanctions would be imposed on Pennsylvania if the Federal Plan were promulgated and PADEP did not then receive approval for a **state** plan implementing RACT for these same Facilities within 18 months. (*See* 86 Fed. Reg. at 51,317, J.A. ___). EPA gave no justification for exposing Pennsylvania to this risk when PADEP had worked diligently to avoid that potential by developing and submitting the Second State Plan. (87 Fed. Reg. 53,381-53,382, J.A. ___). And the absence of that justification is unacceptable when it was **EPA** that initially asked PADEP to delay submitting the Second State Plan and **EPA** that later refused to process any state submission. (PADEP Comments Enclosure 1 at 1-2, J.A. ___).

In short, EPA allowed PADEP to believe that the agencies were working cooperatively toward submission of a SIP revision in compliance with *Sierra Club*,

---

[6] Some of the Second State Plan provisions included in the Title V permits for the Facilities are now, or have been, stayed in related proceedings listed above. *See e.g.*, *Keystone-Conemaugh Projects, LLC*, EHB Docket. No. 2022-041-B (currently staying only certain SCR maintenance-related provisions under modified Title V operating permit).

even asking PADEP to delay certain preliminary submissions for a more efficient process, before then terminating further engagement and using the delay it had itself requested to promulgate the Federal Plan. At no point has EPA provided a reasoned explanation for its actions and, under a statutory scheme in which cooperative federalism is the core principle, this conduct is arbitrary, capricious, and an abuse of discretion by any definition.

## II.  EPA's Promulgation of the Federal Plan Was Arbitrary and Capricious Where the Rolling 30-Day and Daily $NO_x$ Limits are Not Supported by Evidence and Fail to Meet the Standards for RACT.

The Court vacated EPA's approval of the First State Plan in *Sierra Club* because EPA improperly relied on "*ipse dixit* authority" in lieu of evidence-backed conclusions. 972 F.3d at 305. Yet in promulgating the Federal Plan, EPA again relied on *ipse dixit* authority to reach conclusions in three key areas: (1) the condition of the Facilities' SCR systems, (2) the $NO_x$ emissions limits achievable outside the ozone season, and (3) the conflict between the Facilities' ability to achieve the Federal Plan's emissions limits and the Facilities' obligations to PJM. In short, the Federal Plan is affected by the same deficiencies in reasoning as the First State Plan and must therefore be vacated for the same reasons.

### A.  The Rolling 30-day $NO_x$ Limits for the Facilities are Not Supported by Evidence.

EPA focused in the Federal Plan on developing a rolling 30-day $NO_x$ limit for the Facilities that would in turn form the basis for calculating a daily $NO_x$ limit.

In doing so, EPA was required to "examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (internal quotations and citations omitted). EPA also was required to "respond meaningfully to the evidence" presented in comments. *Tesoro Alaska Petroleum Co. v. Fed. Energy Reg. Comm'n*, 234 F.3d 1286, 1294 (D.C. Cir. 2000) (remanding FERC action where agency failed to meaningfully respond to "objections that on their face appear legitimate"). EPA had to "come to grips with the obvious ramifications of its approach and address them in a reasoned fashion." *Nat. Res. Def. Council*, 859 F.2d at 209-10 (internal quotations and citations omitted). In developing the rolling 30-day $NO_x$ limit, however, EPA abandoned its duty to develop evidence and, instead, relied on unsupported assumptions.

### 1. The Rolling 30-day $NO_x$ Limits are Based on Unsupported Assumptions.

#### a. EPA Provided No Evidence to Support its Assumption that Historical Ozone Seasons Represent the Current and Expected Future Performance Conditions of the Facilities' SCR Systems.

Comments submitted by PADEP noted that EPA produced no evidence in the proposed Federal Plan for its selection of historical ozone seasons to represent the current and expected future performance conditions of the Facilities' SCR

systems. (PADEP Comments at 9 & 11, J.A. ___ & ___). Rather than citing evidence in its comment responses for the Federal Plan, EPA justified its choice as being identical to those made when representing SCR performance degradation (and, thus, current capabilities) in two other rulemakings under the CAA. (87 Fed. Reg. at 53,391-53,392, J.A. ___). But the fact that EPA made this assumption before is not proof that the assumption is accurate or reasonable. It is in fact implausible on its face to assume that the SCR equipment at Conemaugh would degrade more slowly simply because it is newer than the SCR equipment installed at the other Facilities. (87 Fed. Reg. at 53,391 n.31, J.A.__). In any case, without evidence that the second or third-best ozone season represents the SCR systems' current performance conditions, EPA's citation to its other rulemakings is no different than a naked appeal to its own technical expertise.

The Court's decision in *Sierra Club* proves the point. One issue was EPA's approval of a 600-degree threshold below which the Facilities would be subject to less restrictive NO$_x$ emissions limits. 972 F.3d at 303. EPA justified its approval as consistent with SCR systems' technical limitations, but the Court found that EPA's own data belied its conclusion by showing that NO$_x$ reduction ranged from 62.5% efficiency at 550 degrees to over 90% at 750 degrees. *Id.* at 304-05. The Court moreover found that EPA had cited no evidence justifying its selection within that range of the 600-degree threshold as RACT. *Id.* at 305. The Court instead

described EPA's case as "boil[ing] down to showing that there is a general connection between setting a limit and lower $NO_x$ removal efficiency, which the record supports, and then asking us to trust their 'technical judgment' as to the proper limit." *Id.* Finding EPA's reliance on its "*ipse dixit* authority" contrary to the law, the Court rejected approval of the 600-degree threshold as arbitrary and capricious. *Id.*

The only factor distinguishing this case from *Sierra Club* is that, here, EPA failed to cite **any** evidence supporting its selection of a second- or third-best ozone years as a proxy for the SCR systems' current performance condition. Just as it was reasonable to recognize a general connection between temperature and $NO_x$ removal efficiency in *Sierra Club*, it is reasonable here to recognize that the performance condition of the Facilities' SCR systems degrades over time. But it is arbitrary and capricious for EPA to deem emissions performance during a particular ozone season as representative of that degradation without evidence and no more than its own *ipse dixit*—just as it was unreasonable to do so for the 600-degree threshold in *Sierra Club*.

> **b.    EPA Provided No Evidence to Support its Assumption that the Facilities Can Achieve Ozone Season $NO_x$ Limits Outside the Ozone Season.**

Commenters also criticized EPA for not citing evidence to support its reliance on ozone-season data to set a rolling 30-day $NO_x$ limit applicable to the

entire year. (PADEP Comments at 11, J.A. ___; KEY-CON Comments at 9-10, J.A. ___). EPA provided two justifications for its choice. In the case of historical non-ozone-season data, EPA argued that it was unrepresentative of the Facilities' true capabilities because SCR systems were often not operated and the then-prevailing regulatory scheme allowed for the purchase of $NO_x$ emissions allowances. (87 Fed. Reg. at 53,392, J.A. ___). EPA further argued that coal-fired EGUs in other states were subject to similar $NO_x$ limits, and, in any case, Keystone had shown it could meet the $NO_x$ limits during periods of SCR usage during non-ozone-season months in 2009 and 2010. (87 Fed. Reg. at 53,395, J.A. ___). The first response, however, is a non-sequitur: it does not follow from the reasons that EPA gave for comparative differences between ozone and non-ozone-season $NO_x$ emissions in the past that those emissions can be equalized in the present. Nor is it an answer to the question of feasibility to say that it has been done by others or done in the past without also showing that the circumstances are alike—something EPA did not do before promulgating the Federal Plan.

EPA in fact took the opposite position on the representativeness of ozone-season data in *Sierra Club*, where it argued that "power needs fluctuate between winter and summer, so using data from only part of the year is not necessarily reflective of the overall pollution possible on a yearly basis." 972 F.3d at 300. Commenters moreover gave EPA specific reasons to avoid facile comparisons to

historical data or out-of-state facilities. KEY-CON had informed EPA that historical data, which would include the non-ozone-season months from 2009 and 2010 relied upon by EPA, reflected its' facilities operation as baseload units rather than cycling units, meaning that there would be fewer instances of the increased $NO_x$ emissions associated with startups and shutdowns. (KEY-CON Comments at 8, J.A. ___).

KEY-CON further reminded EPA that pre-2015 data did not account for changes in SCR operations that were implemented to comply with the mercury air toxics standards that came into effect at that time. (*Id.* at 1 & 7, J.A. ___ & ___). EPA never explained in the preamble to the Federal Plan **why** it was reasonable to set limits representing the Facilities' current cycling operations by reference to decade-old data representing baseload operations. (87 Fed. Reg. at 53,395, J.A. ___). And though EPA argued that mercury air toxics standards were shown to be compatible with similar $NO_x$ limits in a rulemaking under the Cross-State Air Pollution Rule, it overlooked that the facilities considered there were not in Pennsylvania and, thus, not subject to Pennsylvania's more stringent requirements. (MATS Spreadsheet, J.A. ___). EPA's broad generalization also failed to account for the significant effect on aggregate annual $NO_x$ emissions rates from the Facilities' dispatch profiles and SCR system designs. (*See, e.g.,* KEY-CON Comments at 7-11, J.A. ___). EPA failed to consider these dissimilarities in its

comparison, and its analysis is flawed as a result. (*See generally* 87 Fed. Reg. at

53,397, J.A. ___).

As for out-of-state facilities, PADEP noted that they were subject to

different regulatory structures with exceptions for circumstances like startups and

shutdowns and low load operations. (PADEP Comments at 11-12, J.A. ___).

Accounting for those differences made other states' NOx limits **less** stringent than

those in Pennsylvania. (*Id.* at 12, J.A. ___). KEY-CON provided further reasons

for avoiding cross-state comparisons where it showed in its own comment that

certain Maryland facilities were able to take advantage of a fleet-wide $NO_x$

emissions limit under which one facility could provide margin for the others.

(KEY-CON Comments at 10 n.2, J.A. ___). EPA again addressed none of these

issues before promulgating the Federal Plan. (*See generally* 87 Fed. Reg. 53,381-

53,404, J.A. ___).

The failure to articulate a rational basis for a conclusion is just as arbitrary

and capricious as the failure to consider any evidence at all. *See Sierra Club*, 972

F.3d at 298. The Court's decision in *Sierra Club* again proves the point. The Court

held there, for instance, that EPA had not shown that other facilities provided a

relevant point of comparison to those subject to the challenged action, "aside from

speculating that they may be." *Id.* at 301. The Court moreover held that variations

among states' regulatory schemes meant it was "simply not reasonable for the EPA

to attempt to justify its approval … by comparing it with the general pollution limitations in other states." *Id.* at 302. And the Court dismissed EPA's reliance on data where it failed to show how that data led to the approved NO$_x$ limits. *Id.* at 303 ("EPA has failed to adequately explain how and why a 0.12 lb/MMBtu limit is permissible on this record. Although it has offered vague allusions to the inability of unspecified plants to meet a lower standard, the agency has deprived us of the ability to review its decision by not 'show[ing] its work.'" (alteration in original)).

EPA has once again relied on other facilities and other state regulatory schemes without producing any evidence to show that they are remotely comparable. And, once again, EPA has not "shown its work" by which it concluded that ozone-season performances rendered under different regulatory and operational conditions were predictive of the Facilities' current and future operations.

### c. EPA Provided No Evidence to Support its Assumption that the Federal Plan Will Not Impair the Facilities' Legal Obligations to PJM.

The last assumption to draw widespread comment on the proposed Federal Plan was EPA's implied assumption that the Facilities have sole control over the operational parameters that the NO$_x$ limits would force upon them. (KEY-CON Comments at 12-13, J.A. ___). The Facilities reproached EPA for not considering limitations that PJM places on their operations in its capacity as regional

transmission operator. (*Id.*). PJM might call upon a Facility, for instance, to operate in a manner needed to maintain grid reliability but at odds with compliance under the Federal Plan. (Montour Comments at 4, J.A. ___).

EPA responded by making explicit its implied assumption, stating that "EPA believes it is entirely reasonable to assume, first, that the source owners will have the opportunity to consider their emission limits when developing the information they supply to PJM for use in PJM's decision-making process and, second, that PJM's subsequent dispatch instructions will consider the information supplied by the owners when determining the dispatch instructions." (87 Fed. Reg. at 53,398-53,399, J.A. ___). EPA gave no evidence for these assumptions and no consideration to any impacts on regional grid reliability. (*See generally* 87 Fed. Reg. 53,381-53,404, J.A. ___).

The Ninth Circuit's recent decision in *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020), demonstrates the error in EPA's reasoning. At issue there was the Bureau of Ocean Energy Management's approval of an off-shore oil development project based, in part, on its conclusion that greenhouse gas emissions would be greater under a no-action alternative because oil not developed from the project would be replaced by oil from jurisdictions with comparatively weaker environmental standards for exploration, production, and transportation. *Id.* at 736. When commenters noted that the agency's analysis failed

to account for foreign oil consumption, the agency responded that the projected production was too small to have more than a marginal effect on global markets. *Id.* at 737. The Ninth Circuit vacated the approval. It held, as an initial matter, that the agency was not entitled to any deference for areas outside its special area of expertise. *Id.* at 740. And it further found not only that the agency's analysis was implausible on its face, but also that the agency had abdicated its responsibility to adduce evidence in support of its conclusion. *Id.* at 739.

There can be no question that, just as the agency in *Bernhardt* had no special expertise in economic analyses of greenhouse gas emissions, EPA has no special expertise in the areas of power delivery and grid reliability. EPA has acknowledged in submissions to the Congressional appropriations committee, for instance, that "understand[ing] and project[ing] system-wide approaches and trends in areas such as electricity transmission, distribution, and storage" requires "technical and policy expertise not traditionally needed in EPA regulatory development." Fiscal Year 2016: Justification of Appropriation Estimates for the Committee on Appropriations, U.S. Environmental Protection Agency (Feb. 2015), available at https://bit.ly/3Xotf12 (last accessed Jan. 22, 2023). The Supreme Court likewise has found that "EPA has admitted that issues of electricity transmission, distribution, and storage are not within its traditional expertise." *West Virginia v. Env't Prot. Agency*, --- U.S. ---, ---, 142 S. Ct. 2587, 2596 (2022).

Where an agency has no special expertise in making policy judgments, "'Congress presumably would not' task it with doing so." *Id.* at 2613 (quoting, in part, *Kisor v. Wilkie*, --- U.S. ---, ---, 139 S. Ct. 2400, 2417 (2019)). Yet EPA has made those policy judgments here for electricity generation and distribution matters, "assum[ing] first, that the source owners will have the opportunity to consider their emission limits when developing the information they supply to PJM … and, second, that PJM's subsequent dispatch instructions will consider the information … when determining the dispatch instructions." (87 Fed. Reg. at 53,398, J.A. ___). EPA can claim no special expertise for those assumptions and developed no evidence during the rulemaking process to support them. The Federal Plan thus suffers from the same lack of expertise and unsupported assumptions that led *Bernhardt* to vacate the agency action as arbitrary and capricious.

**2.    The Rolling 30-day $NO_x$ Limits Fail to Meet the Standards for RACT.**

Due in part to the unsupported assumptions discussed above, the rolling 30-day $NO_x$ limits that EPA set in the Federal Plan do not meet the legal standards for RACT. Under the longstanding definition given to it by EPA, RACT is "the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility." (87 Fed. Reg. at 53,382, J.A. ___); *see also Sierra Club*, 972 F.3d at 294. But "RACT need not be the best possible emissions limit; it must be

the best limit that is also economically and technically achievable for plant operators." *Sierra Club*, 972 F.3d at 300.

The NO$_x$ limits in the Federal Plan are not RACT because they are neither technologically nor economically feasible. Technological feasibility must consider "the source's process and operating procedures, raw materials, physical plant layout, and any other environmental impacts such as water pollution, waste disposal, and energy requirements." *Id.* at 295 (quoting 57 Fed. Reg. at 18,073). Economic feasibility must consider "the costs of reducing emissions and the difference in costs between the particular source and other similar sources that have implemented emission reduction." *Id.* (same). In promulgating the Federal Plan, however, EPA arbitrarily dismissed operational and regulatory constraints on the Facilities' ability to achieve the NO$_x$ limits, as well as the costs that they would incur in doing so.

### a.    EPA Failed to Adequately Account for the Facilities' Change from Baseload to Cycling Units.

The most significant constraint on the Facilities is their evolution from service as baseload units to cycling units. (Class of 85 Comments at 3, J.A. ___). Instead of operating nearly constantly at high electrical loads, the Facilities now operate episodically, with more frequent startup and shutdown events, and more frequently at lower electrical loads. (*Id.*) This in turn affects the Facilities' ability to control NO$_x$ emissions because their SCR systems were designed for baseload

operations and the higher temperatures associated with higher electrical loads—a point the Court readily accepted in *Sierra Club*. (*Id.*); *see also Sierra Club*, 972 F.3d at 303-04 ("We readily accept that nearly all chemical reactions occur with greater efficiency at higher temperatures …."). $NO_x$ emissions are thus higher during the startup and shutdown events and during lower electrical loads, both of which are inherent to facilities that operate as cycling units (Class of 85 Comments at 3, J.A. ___).

The $NO_x$ limits in the Federal Plan purport to account for this operational difference by using a weighted average of $NO_x$ emissions reflecting active SCR systems ("SCR-on") and inactive SCR systems ("SCR-off"). (87 Fed. Reg. at 53,387, J.A. ___). Assuming that this methodology would ever be appropriate, the fundamental error that EPA made here was to determine the weights (i.e., the proportionate share of SCR-on and SCR-off events) by reference to the Facilities' third-best ozone season since their SCR systems were installed (or, in Conemaugh's case, second-best). (87 Fed. Reg. at 53,399, J.A. ___). This produces an inaccurate bias toward SCR-on operations not only because it considers historical data in which baseload operations were more prevalent, but also because ozone-season data generally reflects greater SCR-on operations due to higher power demands and more favorable climatic conditions. (KEY-CON Comments at 9-11, J.A. ___). The result is a Federal Plan that sets a rolling 30-day $NO_x$ limit

that is at odds with the Facilities' capabilities under current and expected future operations.

The Facilities noted in their comments on the proposed Federal Plan that the rolling 30-day $NO_x$ limits' erroneous bias toward SCR-on conditions would require them to forfeit dispatch opportunities (because the limits did not allow for multiple startups) or extend operations beyond commercial dictates to allow SCR-on operations to average out higher emissions rates during startup. (KEY-CON Comments at 11-13, J.A. ___; Montour Comments at 4, J.A. ___). The consequences of the latter scenario would be particularly perverse because it would "result in meaningfully higher mass emissions of $NO_x$ and other pollutants … than would occur under current operating conditions." (Montour Comments at 4, J.A. ___). Though EPA considered the potential for forfeited dispatch opportunities, albeit inadequately as discussed below, it gave **no** consideration to the potential for its rolling 30-day $NO_x$ limits to force operating conditions that would result in **higher** mass emissions.

To understand EPA's error here, consider an example involving automotive fuel-economy averages. Assume that for ten years an employer dispatches its employee to perform deliveries along a predominantly highway route allowing for sustained high speeds and few stops. The employee unsurprisingly returns fuel-economy averages at the upper end of her vehicle's design. Then, in response to

changes within its industry, the employer begins to dispatch its employee along a predominantly urban route requiring low speeds and frequent stops. It would be arbitrary and unreasonable for the employer to set the employee's fuel-economy targets for the new route using averages from the old route, when the conditions were more favorable for higher fuel-efficiency. Yet that is effectively what EPA has done here with the $NO_x$ limits it set for the Facilities.

> **b.    EPA Failed to Adequately Account for the Facilities' SCR Systems' Technological Limitations and Accelerated Maintenance Costs.**

Additional constraints on the Facilities are based on the limitations inherent in their SCR systems. EPA acknowledged two such constraints in response to comments accompanying the Federal Plan:

> EPA continues to recognize that the $NO_x$ reduction capabilities of the SCRs are flue gas temperature dependent, and that the $NO_x$ removal efficiency curve decreases with flue gas temperature until a point is reached where the SCR offers little or no $NO_x$ control above what is achieved by the low $NO_x$ burners (LNB) and overfire air (OFA) that are also installed on all of the units subject to this FIP. [EPA] also recognize[s] that catalyst fouling, catalyst poisoning, ammonia slip and damage to downstream equipment are all potential outcomes of excessive reagent injection or injection during low temperature conditions. (87 Fed. Reg. at 53,390, J.A. ___).

EPA also purported to recognize that the Facilities' change to cycling units has increased the frequency with which the SCR systems are subject to these limitations. (*Id.*). But its response that the SCR systems can meet the $NO_x$ limits

"during times when boilers are operating at high heat inputs" belies EPA's understanding of the problem, which is that those high heat inputs are infrequent or absent when the Facilities are dispatched as cycling units. (*Id.*).

EPA again misunderstood the nature of the problem when it concluded that establishing the rolling 30-day $NO_x$ limit as a rolling average "allows the sources greater flexibility to vary $NO_x$ emission rates from their SCRs, raising $NO_x$ emission rates up or down in order to balance the various factors that must be taken into account …." (87 Fed. Reg. at 53,391, J.A. ___). As KEY-CON showed EPA in the following table submitted with its comments on the proposed Federal Plan, a single startup event would prevent Keystone from meeting the rolling 30-day $NO_x$ limit:

| Event | Average NOx emission rate (lb/MMBtu) | Nominal Heat Input (MMBtu/hr) | Hours in a 30-day period | No. start-up events in a 30-day period | Total NOx mass emissions (lb) | Total Heat Input (MMBtu) | Heat-Input Average NOx Emission Rate (lb/MMBtu) |
|---|---|---|---|---|---|---|---|
| Start-up * | 0.219 | | 26 | 1 | 6,433 | 29,346 | |
| Full-Load | 0.074 | 8,717 | 694 | | 453,720 | 6,049,598 | |
| Aggregate | | | | | 460,153 | 6,078,944 | 0.075 > 0.074 |

\*:    Actual data for cold-start-up event KEY Unit 1 January 3, 2022 Hour 14 through January 4, 2022 Hour 15

(KEY-CON Comments at 11, J.A. ___). EPA simply misinterpreted this data in the comment responses accompanying the Federal Plan, stating, "Given that this data covered only 25 hours [sic] of startup, and was not then averaged with 29 other days of emission data to arrive at a rolling 30-day average hourly emission rate, it

is not proof that this one unit could not meet EPA's rolling 30-day average rate." (87 Fed. Reg. at 53,391, J.A. ___). The proof, however, was in the second row of the table, which assumed compliance with the rolling 30-day $NO_x$ limit across the remaining 694 hours in a 30-day month. (KEY-CON Comments at 11, J.A. ___). Yet even if this data had not been included, EPA never addressed the likelihood of the Facilities experiencing more than just one startup event during any rolling 30-day period. (87 Fed. Reg. at 53,381-53,404, J.A. ___).

The Facilities' inability to meet the $NO_x$ limits under recommended SCR operating conditions is why their comments emphasized the deleterious effects from increasing ammonia injections to more aggressively control NOx emissions, in disregard of original equipment manufacturer specifications. (KEY-CON Comments at 7, J.A. ___). EPA's response denied any presumption that the Facilities would pursue this strategy, but EPA tacitly required it when the Facilities' operations as cycling units leave no reasonable alternatives. EPA thus was obligated to consider the consequences of increased ammonia injection, such as ammonia slip and catalyst fouling that lead to accelerated maintenance costs and make the SCR systems less effective at their secondary function of mercury control. (PADEP Comments at 9, J.A. ___; KEY-CON Comments at 1, 7 & 10 & Attachment 3 at 11, J.A. ___, ___, ___, & ___; Homer City Comments at 8, J.A. ___). Yet EPA addressed both concerns by referring to cost estimates and pollutant

limits established under other rulemakings—another instance where EPA avoided

providing source-specific evidence and analysis in favor of an appeal to its "*ipse*

*dixit* authority." *Sierra Club*, 972 F.3d at 305.

> **c.    EPA Failed to Adequately Account for the Facilities'
> Legal Obligations to PJM.**

A final, but no less significant, constraint on the Facilities is the control that

PJM exercises over their operations. KEY-CON and other commenters noted that

the proposed Federal Plan made no account for that limitation, even though PJM

generally controls both the Facilities' dispatch and their electrical output.[7] (KEY-

CON Comments at 12-13, J.A. ___). That means that Facilities that might comply

with the FIP by making ammonia injections to control $NO_x$ at lower temperatures

during startup cannot be assured that PJM will permit them to later operate at the

"recovery temperature" needed to vaporize the ammonia bisulfate that will develop

on the SCR systems' catalysts. (*Id.* at 13, J.A. ___). It also means that the Facilities

can only offer PJM for higher electrical loads that support extended SCR usage.

(*Id.* at 12-13, J.A. ___). KEY-CON thus commented that the proposed Federal Plan

---

[7] Exceptions to the rule are rare and typically limited to load-verification tests, environmental emission tests, and forced or maintenance derates. (KEY-CON Comments at 12-13, J.A. ___).

took an improper operations-forcing approach to the RACT determination. (*Id.* at 13, J.A. \_\_\_).

EPA downplayed the operational consequences of the Federal Plan in its comment responses, contending that "all emission limits place restrictions on how sources operate in some fashion." (87 Fed. Reg. at 53,393, J.A. \_\_\_). Yet the depth of intrusion into the Facilities' operations is shown by how EPA conceived of the Facilities restructuring their offers to PJM. (87 Fed. Reg. at 53,398, J.A. \_\_\_). According to EPA, the Facilities should at a minimum revisit their offer specifications for: (1) minimum energy available for economic dispatch; (2) default ramp rates for increasing or decreasing output; and (3) compensable startup costs. (*Id.*). Even then, EPA acknowledged that the Facilities might be required to forfeit dispatch opportunities at lower electrical loads and suffer the revenue impacts. (*Id.*). For the most part, though, EPA simply assumed that the Facilities and PJM can reconcile dispatch and operating obligations with the $NO_x$ limits in the Federal Plan—an assumption that, as discussed above, EPA had neither the expertise nor evidence to support.

Even if EPA had expertise in energy markets and supported its assumptions with record evidence, the agency does not satisfy RACT by forcing **operational** changes. *See Sierra Club*, 972 F.3d at 309 ("That proposal [developed on remand] must be technology forcing, in accord with the agency's RACT standard ….").

RACT is a technology-forcing standard that requires technological feasibility, meaning methods that "consider the source's process and operating procedures, raw materials, physical plant layout, and any other environmental impacts such as water pollution, waste disposal, and energy requirements." *Sierra Club*, 972 F.3d at 295 (quoting 57 Fed. Reg. at 18,073). Absent from that definition is any authority for EPA to go beyond **considering** the Facilities' operations in favor of **coopting** them. Nor is that authority fairly implied in the definition; forcing the Facilities to reduce or significantly amend their operations is neither "reasonable" nor "technology" for purposes of RACT.

EPA also does not satisfy RACT by ignoring the economic effects that the Facilities will experience from the operations-forcing standards under the Federal Plan. A RACT analysis pairs technological feasibility with economic feasibility, which means giving consideration to "the costs of reducing emissions and the difference in costs between the particular source and other similar sources that have implemented emission reduction." *Id.* at 295 (quoting 57 Fed. Reg. at 18,073). EPA addressed this issue in the context of PJM only briefly in its comment responses, stating that "EPA views these as free-market considerations, rather than an appropriate component of a RACT determination." (87 Fed. Reg. at 53,390, J.A. ___). But it is decidedly **not** a free market when the $NO_x$ limits promulgated by EPA force changes in how the Facilities participate in that

market—a point that is evident from EPA's discussion in the same responses of the various ways in which the Facilities and PJM must restructure their relationships. (87 Fed. Reg. at 53,397-53,398, J.A. ___). And it is arbitrary and capricious for EPA to overlook, as part of an economic feasibility analysis, the Facilities' capacity to support the accelerated maintenance costs that the Federal Plan will impose with the reduced revenue opportunities that the Federal Plan will allow.

Finally, EPA must "come to grips" with the ramifications of the Federal Plan for grid reliability. *See Nat. Res. Def. Council*, 859 F.2d at 209. The Fifth Circuit in fact stayed enforcement of a FIP addressing regional haze in parts of Texas and Oklahoma where EPA had "summarily dismissed concerns about grid reliability in Texas" based on conclusions from an outside expert report. *Texas v. U.S. Env't Prot. Agency*, 829 F.3d 405, 432 (5th Cir. 2016). Given that grid reliability was a complex issue outside EPA's expertise, that EPA had limited authority to dictate how the electric grid should be run, and that the CAA requires EPA to consider "energy … impacts of compliance," the Fifth Circuit found it "noteworthy that the [challenged FIP] provides neither an exemption from compliance when necessary to preserve the power supply nor a more rigorous exploration of the impact of the Final Rule on grid reliability." *Id.* at 433 (quoting, in part, 42 U.S.C. § 7491(g)(1)). EPA here did not give even the bare consideration of grid reliability that the Fifth

Circuit deemed insufficient in *Texas*, and the Federal Plan is arbitrary and capricious for this reason, too.

**B.    The Daily NO$_x$ Limits for the Facilities Were Calculated Using the Erroneous Rolling 30-day NO$_x$ Limits**

In addition to establishing rolling 30-day NO$_x$ limits, the Federal Plan also establishes daily NO$_x$ limits. (87 Fed. Reg. at 53,403, J.A. ___). But rather than conduct a separate analysis to determine those daily NO$_x$ limits, EPA simply took the rolling 30-day NO$_x$ limit and multiplied it by the 24-hour nominal maximum heat input for each EGU at the Facilities. (87 Fed. Reg. at 53,385, J.A. ___). The errors underlying EPA's determination of the rolling 30-day NO$_x$ limits for the Facilities thus carry over into EPA's determination of the daily NO$_x$ limit and require vacatur of the Federal Plan in its entirety.

**III.    KEY-CON Adopts and Incorporates the Briefs Submitted by Homer City and PADEP.**

Pursuant to Fed. R. App. P. 28(i) and the Court's November 1, 2022, Order, KEY-CON adopts and incorporates by reference the briefs submitted by Homer City and PADEP.

# CONCLUSION

For the foregoing reasons, the Court should vacate the Final Action and remand to EPA with directions consistent with the Court's opinion.

**Dated**: January 23, 2023                    Respectfully submitted,


Gina N. Falaschi (DC 198197)          **/s/ Joseph V. Schaeffer**
BABST, CALLAND, CLEMENTS            Michael H. Winek (PA 69464)
 AND ZOMNIR, P.C.                    Joseph V. Schaeffer (PA 323256)
505 9th Street NW, Suite 602         BABST, CALLAND, CLEMENTS
Washington, DC 20004                  AND ZOMNIR, P.C.
(202) 853-3455                       Two Gateway Center, Floor 8
gfalaschi@babstcalland.com           603 Stanwix Street
                                     Pittsburgh, PA 15222
                                     (412) 394-5400
                                     mwinek@babstcalland.com
                                     jschaeffer@babstcalland.com

                                     *Counsel for Petitioner Keystone-*
                                     *Conemaugh Projects, LLC*

## CERTIFICATE OF COMPLIANCE

On this 23rd day of January, 2023, the undersigned certifies that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 12,100 words, as determined by the word-count function of Microsoft Word and excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because the body of the brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

3.      All counsel of record are members in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

4.      The electronic version of this Brief for Appellee is identical to the paper copies of the brief filed with the Court.

5.      A virus detection program, Windows Security Virus & Threat Prevention, formerly known as Windows Defender, version 4.18.2211.5 was run on the electronic version of the brief and no viruses were detected.

**January 23, 2023**                                             **/s/ Joseph V. Schaeffer**
                                                            Joseph V. Schaeffer (PA 323256)
                                                            *Counsel for Petitioner*
                                                            *Keystone-Conemaugh Projects, LLC*

54

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(d), the undersigned certifies that on this 23rd day of January, 2023, he caused the Brief for Appellee to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished on this 23rd day of January, 2023, by the CM/ECF system via electronic mail.

**January 23, 2023**                              <u>**/s/ Joseph V. Schaeffer**</u>
Joseph V. Schaeffer (PA 323256)
*Counsel for Petitioner*
*Keystone-Conemaugh Projects, LLC*