# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

## No. 22-3026
## (and consolidated case No. 22-3039)

---

### KEYSTONE-CONEMAUGH PROJECTS, LLC

*Petitioner*,

v.

### UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents*.

---

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency

---

### SIERRA CLUB'S OPPOSITION TO
### PETITIONERS' MOTIONS FOR A STAY

---

Charles McPhedran
Pa. Bar ID No. 60123
Earthjustice
1617 John F. Kennedy Blvd.
Suite 2020
Philadelphia, PA 19103
(215) 717-4521
cmcphedran@earthjustice.org

Zachary M. Fabish
DC Bar ID No. 986127
Sierra Club
50 F Street, NW – 8th Floor
Washington, DC 20001
(650) 388-8466
zachary.fabish@sierraclub.org

Mychal Ozaeta
Cal. Bar ID No. 309851
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
(213) 766-1069
mozaeta@earthjustice.org

*Counsel for Intervenor-Respondent Sierra Club*

**February 27, 2023**

TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................1

II.  BACKGROUND .................................................................................................2

III. ARGUMENT.......................................................................................................4

    A. Because Petitioners' Delay in Moving for a Stay Has Waived any Credible
       Claim of Urgency or Injury, and Because Their Notice of the Motion Was
       Not Reasonable, Their Motion for a Stay Should Be Denied ...........................4

    B. Petitioners Are Not Likely to Succeed on the Merits.......................................6

    C. Petitioners Have Failed to Carry Their Burden to Demonstrate that Potential
       Compliance Costs Constitute Irreparable Harm................................................8

    D. A Stay Would Substantially Harm the Sierra Club and the Public.................14

    E. A Stay is Not in the Public Interest. ...............................................................18

IV. CONCLUSION..................................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*A. O. Smith Corp. v. F.T.C.*, 530 F.2d 515 (3d Cir. 1976).............................. 8, 9, 12

*ADP, Inc. v. Levin*, 2022 WL 1184202 (3d Cir. Apr. 21, 2022) ...........................11

*Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328 (7th Cir. 1980) .......................................9

*Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176 (3d Cir. 2008) ............................................................................................................................11

*Columbia Gas Transmission*, 768 F.3d 300 (3d Cir. 2014).....................................12

*Constructors Ass'n of W. Pennsylvania v. Kreps*, 573 F.2d 811 (3d Cir. 1978).......9

*Duke Power v. Carolina Envtl. Study Gr.*, 438 U.S. 59 (1978)...............................15

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100 (3d Cir. 1988).8

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ...............................................................................................................................15

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248 (3d Cir. 2005) ..........15

*Marland v. Trump*, 498 F.Supp.3d 624 (W.D. Penn. 2020) .....................................13

*Maryland-Nat'l Cap. Park & Plan. Comm'n v. U.S. Postal Serv.*, 487 F.2d 1029 (D.C. Cir. 1973) .........................................................................................................19

*Minard Run Oil Co.*, 670 F.3d 236 (3d Cir. 2011) .......................................... 12, 13

*Morton v. Beyer*, 822 F.2d 364 (3d Cir. 1987) .........................................................8

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604 (D.C. Cir. 1980) ....18

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................................................6

*Sierra Club v. EPA*, 972 F.3d 290 (3d Cir. 2020) ........................................... 2, 3, 16

*State of Connecticut v. Com. of Mass.*, 282 U.S. 660 (1931) ...................... 10, 11, 14

*Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515 (1937) .................................19

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ........................... 8, 14

**Statutes & Regulations**

42 U.S.C. § 7401(b) ..............................................................................................18

40 C.F.R. § 81.339 .................................................................................................3

57 Fed. Reg. 55,620 (Nov. 25, 1992) .....................................................................2

80 Fed. Reg. 12,264 (Mar. 6, 2015).......................................................................18

80 Fed. Reg. 65,292 (Oct. 26, 2015)................................................................ 16, 17

81 Fed. Reg. 74,504 (Oct. 26, 2016)......................................................................16

84 Fed. Reg. 20,274 (May 9, 2019) .........................................................................3

87 Fed. Reg. 53,381 (Aug. 31, 2022) ............................................................ *passim*

Fed. R. App. P. 18(a)(2)(C) .....................................................................................5

## SIERRA CLUB'S OPPOSITION TO
## PETITIONERS' REQUESTS FOR A STAY

Intervenor-Respondent Sierra Club hereby responds to the motions for stay filed by Petitioners Keystone-Conemaugh Projects, L.L.C. ("KeyCon") and Homer City Generation L.P. ("Homer City") on February 13, 2023. The motions should be denied because Petitioners fail to meet the reasonable notice requirements of Fed. R. App. P. 18, because Petitioners' extended delay in filing the motions waives any claim of urgency or injury, because Petitioners have failed to demonstrate likelihood of success on the merits or irreparable harm, because a stay would harm the public and is not in the public interest, and for the additional reasons set forth in the separate response filed by Respondents U.S. Environmental Protection Agency and U.S. Environmental Protection Agency Administrator Michael S. Regan (collectively "EPA").

## I. INTRODUCTION

This proceeding is a challenge to EPA's promulgation of a federal plan setting emission limits for nitrogen oxides ("NOx") emitted from coal-fired electric generating units equipped with selective catalytic reduction ("SCR") controls in Pennsylvania in order to meet the Clean Air Act's reasonably available control technology ("RACT") requirements for the 1997 and 2008 ozone national ambient

air quality standards ("NAAQS" or "National Standards").[1]  The Federal Plan was promulgated in response to a decision by this Court to vacate and remand a portion of EPA's prior approval of Pennsylvania's "RACT II" rule.  *See Sierra Club v. EPA*, 972 F.3d 290, 309 (3d Cir. 2020).

## II.  BACKGROUND[2]

The Federal Plan establishes NOx emission limits for nine units across four facilities in Pennsylvania to address the Clean Air Act's RACT requirements for the 1997 and 2008 ozone National Standards.  RACT is a technology-forcing standard that requires improvements in control technology and reductions in pollutant emissions.[3]  RACT is defined as "the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility."[4]  Because EPA had designated parts of Pennsylvania as nonattainment for ozone,[5]

---

[1] Federal Implementation Plan Addressing Reasonably Available Control Technology Requirements for Certain Sources in Pennsylvania, 87 Fed. Reg. 53,381 (Aug. 31, 2022) ("Federal Plan").

[2] This is a condensed version of the Background section in the Motion of Sierra Club to Intervene on Behalf of Respondents at 2-8 (No. 22-3026, Doc. 15, Nov. 23, 2022).

[3] *See Sierra Club v. EPA*, 972 F.3d at 295 ("RACT is not designed to rubber-stamp existing control methods.  It is a technology-forcing mechanism.").

[4] State Implementation Plans; Nitrogen Oxides Supplement to the General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990, 57 Fed. Reg. 55,620, 55,624/3 (Nov. 25, 1992).

[5] Allegheny, Armstrong, Beaver, Berks, Bucks, Butler, Carbon, Chester, Delaware, Fayette, Lancaster, Lehigh, Montgomery, Northampton, Philadelphia, Washington,

and because Pennsylvania is part of the Ozone Transport Region, Pennsylvania was required to prepare a RACT revision to its plan for major stationary sources of the ozone precursor pollutants, NOx and volatile organic compounds, in Pennsylvania. *Sierra Club*, 972 F.3d at 294 n.10 (citing 42 U.S.C. §§ 7511c(a), 7502(c)(1)).

On May 9, 2019, EPA issued a final approval for most parts of Pennsylvania's submission regarding RACT, including the emission limits for selective catalytic reduction-equipped coal-fired power plants. *Id*. at 297.[6] After Sierra Club sought judicial review of EPA's action, this Court vacated and remanded EPA's approval because it found that Pennsylvania's RACT II rule was "neither supported by adequate facts nor by reasoning found in the administrative record." *Id*. at 293. As a result, this Court directed EPA to "either approve a revised, compliant [state implementation plan] within two years or formulate a new federal implementation plan." *Id.* at 309. In response to this Court's order, EPA promulgated the Federal Plan, which will result in significant reductions in NOx

---

and Westmoreland Counties. *See* Pa. Dep't of Env't Prot., "Attainment Status by Principal Pollutants," https://www.dep.pa.gov/Business/Air/BAQ/Regulations/pages/attainment-status.aspx (last visited Feb. 26, 2023); *see also* 40 C.F.R. § 81.339.

[6] *See also* Approval and Promulgation of Air Quality Implementation Plans; Pennsylvania; Regulatory Amendments Addressing Reasonably Available Control Technology Requirements Under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards, 84 Fed. Reg. 20,274 (May 9, 2019).

pollution due to lower NOx emission limits that do not include temperature thresholds or a tiered approach.

## III. ARGUMENT

### A. Because Petitioners' Delay in Moving for a Stay Has Waived any Credible Claim of Urgency or Injury, and Because Their Notice of the Motion Was Not Reasonable, Their Motion for a Stay Should Be Denied.

EPA published the rule at issue in this proceeding on August 31, 2022, with an effective date of September 30, 2022. 87 Fed. Reg. at 53,381/2. Petitioners KeyCon and Homer City filed their petitions for review on October 27 and October 28, 2022.[7] Petitioners and Intervenor Pennsylvania Department of Environmental Protection filed, collectively, three proof merits briefs on January 23, 2022.[8] Proof merits briefs for Respondent EPA and Intervenor-Respondent Sierra Club are due on March 24, 2022.

Assuming they could satisfy the other criteria of Fed. R. App. P. 18, Petitioners could have filed their motions for stay any time since the filing of the petitions for review in October of 2022. If the situation described in their motions were truly urgent or "irreparable," Petitioners could have pursued the stay remedy long before now. Instead, Petitioners have delayed for four months.

---

[7] Respectively, No. 22-3026, Doc. 1-1; No. 22-3039, Doc. 1-1.
[8] No. 22-3026, Doc. 28-1; No. 22-3039, Doc. 30; No. 22-3026, 27-1.

Before filing a motion for a stay, "[t]he moving party must give *reasonable* notice of the motion to all parties." Fed. R. App. P. 18(a)(2)(C) (emphasis added). Here, Petitioners ambushed EPA with notice of their motions after business hours on Friday, February 10, before filing their motions on Monday, February 13. Petitioners could have provided their notices much sooner, for example, by disclosing their intentions to the other parties when Petitioners and EPA were cooperating on a motion to extend the briefing in December of 2022. The timing of the notice, which compounded the timing issues regarding merits briefing noted in the next paragraph, was unreasonable under Fed. R. App. P. 18(a)(2)(C), and the motion should be denied.

Petitioners waited to file their motions for a stay until after they had filed their own merits briefs. Indeed, Petitioners filed the motions for stay during the period when the EPA and the Sierra Club are preparing their own merits briefs. Since Petitioner Homer City's Motion for a Stay includes (at 11-17) a "success on the merits" discussion, with a shortened version of the arguments in their Merits Brief, the tight turnaround for a response to a stay motion has the effect of forcing EPA and Sierra Club to address merits issues in a shorter period than the merits briefing schedule set by the Court. It also has the effect of taxing government resources at a time when EPA must also be preparing its merits briefs.

Petitioners' delay in filing motions for a stay demonstrates the tactical timing of the motions. If the motions actually presented urgent issues (economic or otherwise) requiring the Court's attention before merits briefing, they would have been filed last year, soon after the petitions for review. Since Petitioners have delayed and their motions are demonstrably not urgent, the Court should deny the stay motion and rule on the petitions for review in the normal course of litigation.

**B. Petitioners Are Not Likely to Succeed on the Merits.**

To prevail on a stay motion, a movant must demonstrate: (1) a likelihood of success on the merits; (2) irreparable harm absent a stay; (3) lack of harm to other parties from a stay; and (4) that a stay would serve the public interest. *Nken v. Holder*, 556 U.S. 418, 433-34 (2009) ("The party requesting a stay bears the burden of showing that the circumstances justify" a stay). Petitioners have failed to carry this burden, and thus their motions should be denied.

Homer City attempts to show likelihood of success on the merits by suggesting that it only need succeed on one of the many arguments it and KeyCon have submitted in their merits briefs. Homer City at 11. But the likelihood that one of multiple weak arguments prevails is not enhanced by there being many of them: the appellate courts are not casinos. That is especially true here, where many of Petitioners' arguments have already been addressed by EPA. For example, while Homer City claims EPA failed to develop "source-specific"

6

emission limits (Homer City at 12), EPA actually did use "source-specific third-best ozone season" data that demonstrates "the lowest rate the source is technologically and economically capable of achieving, not the average rate it has already achieved." 87 Fed. Reg. at 53,391/2. Similarly, Homer City objects to EPA's use of "second-best ozone season" data for Conemaugh (Homer City at 14), while ignoring the reality that "Conemaugh's SCR was only installed in late 2014 and EPA therefore doesn't have the same volume of operating data as for the other sources." 87 Fed. Reg. at 53,391/3 n.31. Homer City's claim that EPA did not account for "year-round" operations of NOx controls (Homer City at 14) was likewise addressed in the comment response: EPA analyzed ozone season emissions data "because it is indicative of what these units can achieve" when regulations require SCR operation. 87 Fed. Reg. at 53,395/2. EPA further noted that "there are many coal-fired EGUs, outside of Pennsylvania, that can, and do, operate their SCR controls year-round with NOx emission limits similar" to those of the Federal Plan, and that in fact some of Petitioners' units have historically "operated their SCRs in non-ozone season months for extended periods whereby their NOx emissions were generally below" the Federal Plan limits. *Id.* at 53,395/3.

Thus, EPA has already responded to, and resolved, many of Petitioners' merits arguments. Accordingly, Petitioners have failed to demonstrate a likelihood

of success on the merits, and no stay is warranted.

**C. Petitioners Have Failed to Carry Their Burden to Demonstrate that Potential Compliance Costs Constitute Irreparable Harm.**

Petitioners have also failed to carry their burden to establish irreparable harm. Irreparable harm is not demonstrated simply by economic costs or loss of income. *See Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987) ("we do not believe that loss of income alone constitutes irreparable harm"); *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988) (no injunction where only harms were economic). Instead, "the requisite is that the feared injury or harm be irreparable—not merely serious or substantial." *A. O. Smith Corp. v. F.T.C.*, 530 F.2d 515, 525 (3d Cir. 1976); *see also Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (it is "only where the loss threatens the very existence of the movant's business" that economic harm is irreparable).

Although Petitioners appear to argue that any potential costs from complying with government regulation constitute irreparable harm, this Circuit has long recognized that while "[a]ny time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it would hardly be contended that proof of such an injury alone would satisfy the requisite for a preliminary injunction." *A. O. Smith Corp. v. F.T.C.*, 530 F.2d at

527-28 (vacating grant of an injunction, and observing that "[t]hese are not 'small' corporations" and that "the cost of compliance will have to be considered a necessary business expense, albeit government mandated, and not a loss of profits in any usual sense of that term."); *see also Constructors Ass'n of W. Pennsylvania v. Kreps*, 573 F.2d 811, 819 (3d Cir. 1978) (mere cost of complying with federal rule "does not rise to the level of irreparable injury"); *accord Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) (citing *A. O. Smith Corp. v. F.T.C.*) ("injury resulting from attempted compliance with government regulation ordinarily is not irreparable harm").

Attempting to sidestep this authority, Petitioners claim as irreparable harm just such compliance costs: operating and updating their SCR controls, cleaning their controls, and reagent for their controls. *See* Homer City at 9; KeyCon at 11, 13. But, Petitioners do not demonstrate how these costs rise above being at most "merely serious or substantial," to threaten the very existence of their businesses— indeed, KeyCon does not make *any* attempt to enumerate these costs at all, and while Homer City does assert some numbers (Homer City at 9) ("approximately $3.2 million per Unit per year . . . capital cost of approximately $4.2 million per Unit . . . approximately $810,000 per Unit per year"), these figures pale in comparison to the "hundreds of millions of dollars" Homer City has spent "[t]hroughout its history" upgrading pollution controls and the "approximately

"$400 million each year" Homer City spends "on goods and services."  Homer City at 4.[9]

Petitioners' arguments that compliance with the Federal Plan may subject them to "contractual penalties" from PJM also fail.  *See* KeyCon at 13; Homer City at 18.  First, Petitioners characterize such harms as mere possibilities, which cannot form the basis of irreparable harm.  *Compare* KeyCon at 13-14 ("*If* PJM's dispatch instructions are inconsistent with the operating practices needed to meet emissions under the Federal Plan," KeyCon would face an "unpalatable *choice*" to breach obligations to PJM) (emphasis added); *and* Homer City at 18 ("*If* Units 1 and 2 cannot meet the limits" Homer City could be "unable to meet its capacity obligation committed to PJM") (emphasis added); *with State of Connecticut v. Com. of Mass.*, 282 U.S. 660, 674 (1931) ("Injunction issues to prevent existing or presently threatened injuries. One will not be granted against something merely feared as liable to occur at some indefinite time").  Second, even if such economic losses were concrete and specifically identified by Petitioners, they do not become irreparable simply by virtue of a contract with a third party like PJM.  *See, e.g.,*

---

[9] Petitioners notably fail to include savings that they would incur by decreasing their NOx emissions under the Federal Plan.  As EPA notes in the final rule, "the market prices of NOx allowances needed for compliance with the" Revised Cross State Air Pollution Rule Update during the 2022 ozone season "were reported to range between $20,000 and $40,000 per ton" (87 Fed. Reg. at 53,390/1); as such, reductions in ozone season NOx emissions under the Federal Plan could save Petitioners millions of dollars by freeing up allowances.

*Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 178-79

(3d Cir. 2008) (vacating injunction and noting that a plaintiff "cannot convert

monetary harm into irreparable harm simply by claiming that [it] has prevented it

from performing contracts with others and that this subsequent failure to perform

will harm the plaintiff's reputation."). Finally, as EPA noted in its response to

comments, Petitioners have a variety of options to communicate their availability

and operational parameters to PJM, such that their "role as suppliers of inputs to

PJM's decision-making process means that the sources in fact are well positioned

to prevent PJM's dispatch instructions from interfering with the sources'

compliance strategies." 87 Fed. Reg. at 53,398/1.[10]

Moreover, Petitioners' discussions of potential difficulties complying with

the Federal Plan are belied by their historical and recent actual operations. Because

"the calculation of the limits uses actual past performance data from the sources,

which include times at low heat input and therefore time with the SCR off, sources

can meet these limits" as past practice has demonstrated. 87 Fed. Reg. at 53,390/2.

---

[10] Homer City's conclusory and unsupported statement that if it turns out that
Homer City cannot always meet the Federal Plan limits, Homer City would be
"force[d] to "decommission" Units 1 and 2 (Homer City at 18), is also speculative
and unavailing. *State of Connecticut v. Comm. of Mass.*, 282 U.S. at 674; *see also*
*ADP, Inc. v. Levin*, 2022 WL 1184202, at *3 (3d Cir. Apr. 21, 2022) (plaintiff
failed to establish irreparable harm because it "offered only conclusory allegations
that it may lose clients, goodwill, or referral business" in support of claims of
harm). Nowhere does Homer City explain the basis for such a decommissioning
and the absence of any alternative course of action.

Likewise, "historical data, and in fact, some data from the 2022 ozone season reported so far, supports a determination that the sources can achieve EPA's final 30-day NOx emission rate limits, and that when the units operate in compliance with the 30-day rate limit, they have generally operated below the final daily NOx mass emission limits." 87 Fed. Reg. at 53,396/3. Petitioners' failure to operate their installed NOx controls frequently enough to comply with the Federal Plan does not mean that costs incurred if they did operate these controls constitute irreparable harm. *A. O. Smith Corp. v. F.T.C.*, 530 F.2d at 527.

The cases relied on by Petitioners do not compel a different result. In both *Columbia Gas Transmission, LLC v. 1.01 Acres* and *Minard Run Oil Co. v. U.S. Forest Service*, the court determined that the appellees *had already* succeeded on the merits. *See Columbia Gas Transmission*, 768 F.3d 300, 315 (3d Cir. 2014) ("Having already determined that Columbia has succeeded on the merits, we now examine whether Columbia will suffer irreparable injury if it is denied relief"); *Minard Run Oil Co.*, 670 F.3d 236, 254 (3d Cir. 2011) (determining that issuance of a notice to proceed, or NTP, to access oil and gas rights in National Forest bounds is not a "major federal action" under NEPA, an environmental analysis "need not be completed prior to issuing an NTP," and as such "appellees were likely to succeed on their claim that NEPA does not require the Service to conduct an environmental analysis prior to issuing an NTP"). *Minard Run Oil* also

12

considered injunctive relief to be "particularly appropriate" because "real property" interests were at stake: Pennsylvania's "rule of capture" meant that owners of oil and gas rights inside the National Forest but precluded by the Forest Service from accessing those rights could lose out to drillers just outside the National Forest depleting a common reservoir. *Id.* at 256. In *Marland v. Trump*, the court considered the U.S. Commerce Department's prohibition of the social media application TikTok and concluded that plaintiffs with "millions of followers" who had "tried and failed to establish a following and work as an influencer on competitive platforms" would be irreparably harmed by the "certain" entire loss of their TikTok-based businesses absent an injunction. 498 F.Supp.3d 624, 641 (W.D. Penn. 2020). No such situation exists here, where the alleged increased environmental compliance costs are, by Petitioners' own admission, either unenumerated or a small fraction of the "$400 million" that Homer City alone annually spends on "goods and services" (Homer City at 4), not a definite and complete loss of business.

Finally, Petitioners' speculation that if they decide to operate in violation of the Federal Plan they might have trouble with future permitting does not constitute irreparable harm. Homer City at 21 (suggesting that if Homer City fails to comply, and "*If* Homer City is unable to maintain its current permits or obtain new permits," it might need to shut down entirely) (emphasis added); KeyCon at 14.

13

Potential issues with future permitting are theoretical and not actual harm. *State of Connecticut v. Comm. of Mass.*, 282 U.S. at 674. Indeed, Homer City has a lengthy history of environmental compliance difficulties, and yet this does not appear to have caused it to be unable to maintain or renew its permits. *See* U.S. EPA, Enforcement and Compliance History Online Detailed Facility Report for Homer City Generating Station[11] (noting eight quarters in noncompliance with the Clean Air Act, six quarters with "significant violation," one informal and four formal enforcement actions within the past five years, and tens of thousands of dollars in penalties from formal enforcement actions); *Wisconsin Gas Co. v. FERC*, 758 F.2d at 674 ("The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future.")

Accordingly, Petitioners' requests for a stay should be denied.

**D. A Stay Would Substantially Harm the Sierra Club and the Public.**

A stay would cause substantial harm to Sierra Club's members who live, work, and recreate in areas near the facilities regulated by the Federal Plan by exposing them to additional toxic air pollution and increasing and prolonging

---

[11] *Available at* https://echo.epa.gov/detailed-facility-report?fid=110000330339 (last visited February 26, 2023).

related harms to their health and welfare interests. Yet Petitioners have not even addressed the harm their requested stay would cause to Sierra Club or the public.

A stay of the Federal Plan's compliance date would cause additional pollution that Sierra Club's members and other exposed members of the public would otherwise never have to breathe. Exposure, alone, to additional "non-natural" pollution is recognizable harm. *See, e.g.*, *Duke Power v. Carolina Envtl. Study Gr.*, 438 U.S. 59, 74 (1978) ("emission of non-natural radiation into appellees' environment would also seem a direct and present injury"). Exposure also creates other harms, including increased risk of asthma attacks and other health impacts and, at least, a reasonable concern about such risks which, in turn, undermines Sierra Club's members' ability to enjoy daily life. *See, e.g.*, Motion of Sierra Club to Intervene on Behalf of Respondents (No. 22-3026, Doc. 15, Nov. 23, 2022) at 11-13 and Exhibits B-E. Such injuries provide reason to deny a stay, just as they provide grounds for Article III standing.[12]

The Federal Plan will reduce ozone concentrations in the ambient air because power plants are a significant source of ozone-forming NOx pollution, and reductions in their NOx emissions lead to important improvements in air quality.

---

[12] *See, e.g.*, *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 256-57 (3d Cir. 2005); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

15

*Sierra Club v. EPA*, 972 F.3d at 294.[13]  NOx emissions increase ozone

concentrations in the ambient air.[14]  Ozone, the main component of smog, is a

corrosive air pollutant that inflames the lungs, constricts breathing, and likely kills

people.[15]  Ozone causes and exacerbates asthma attacks, emergency room visits,

hospitalizations, and other serious health harms.[16]  Ozone-induced health problems

can force people to change their ordinary activities, requiring children to stay

indoors and forcing people to take medication and miss work or school.[17]

Ozone can harm healthy adults, but others are even more vulnerable.[18]

Because their respiratory tracts are not fully developed, children are especially

vulnerable to ozone pollution, particularly when they have elevated respiratory

---

[13] *See also* Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 Fed. Reg. 74,504, 74,514/2 (Oct. 26, 2016) (EPA observed that "studies have found that [electric generating unit] NOx emission reductions, particularly, can be effective in reducing ozone pollution as quantified by the form of the 2008 ozone standard, 8-hour peak concentrations" and that "studies have found that [electric generating unit] NOx emission reductions can be effective in reducing the upper end of the cumulative ozone distribution in the summer on a regional scale.").
[14] *See* EPA, "Ground-level Ozone Basics," https://www.epa.gov/ground-level-ozone-pollution/ground-level-ozone-basics#formation (last visited Feb. 26, 2023).
[15] *See* National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292, 65,308/1-3 (Oct. 26, 2015); EPA, Integrated Science Assessment for Ozone and Related Photochemical Oxidants, at 2-20 to -24, tbl.2-1 (Feb. 2013) (EPA-HQ-OAR-2008-0699-0405) ("Science Assessment").
[16] *See, e.g.*, EPA, Policy Assessment for the Review of the Ozone National Ambient Air Quality Standards, at 3-18, 3-26 to -29, 3-32 to -35 (Aug. 2014) (EPA-HQ-OAR-2008-0699-0404) ("Policy Assessment"); Science Assessment at 2-16 to -18, 2-20 to -24, tbl.2-1.
[17] *See, e.g.*, Policy Assessment at 4-12.
[18] *See* 80 Fed. Reg. at 65,310/1-3.

rates, as when playing outdoors.[19]  People with lung disease and the elderly also have heightened vulnerability.[20]  People with asthma suffer more severe impacts from ozone exposure than healthy individuals do and are more vulnerable at lower levels of exposure.[21]

In addition to harming Sierra Club's members, a stay of the Federal Plan would harm millions of other members of the public.  The seventeen Pennsylvania counties that fail to meet the ozone standard[22] contain over 8.3 million residents, or roughly two-thirds of the state's total population.[23]  Moreover, millions of Pennsylvania residents are particularly susceptible to ozone pollution, including over 2.4 million seniors and 2.6 million children, and over 1.3 million asthma sufferers.[24]

A stay of the Federal Plan's compliance dates would only extend the delay that has already impacted Sierra Club's members and the affected public. Pennsylvania's RACT requirements were required to be implemented by January

---

[19] *See, e.g.*, Policy Assessment at 3-81 to -83.
[20] *See* 80 Fed. Reg. at 65,310/3.
[21] *Id.* at 65,311/1 n.37, 65,322/3.
[22] *See* note 5, *supra*.
[23] *See* U.S. Census Bureau, "Explore Census Data," https://data.census.gov/cedsci/ (last visited Feb. 25, 2023).
[24] *See* Am. Lung Ass'n, State of the Air 2022, "Report Card: Pennsylvania," Groups at Risk, https://www.lung.org/our-initiatives/healthy-air/sota/city-rankings/states/pennsylvania/ (last visited Feb. 25, 2023).

1, 2017–over 6 years ago.[25]  A stay would not only cause additional pollution, but it would also delay protections that Sierra Club's members and the public have been waiting many years for.  In light of this information, the increased health risks and other harm caused by additional exposure to toxic air pollution are too significant to permit the requested stay.  Thus, a stay of the Federal Plan's compliance date should be denied in order to protect the public health and welfare. *See* 42 U.S.C. § 7401(b) (Clean Air Act purpose includes "[t]o protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population").

### E.  A Stay is Not in the Public Interest.

The Court should deny a stay because the public interest in preventing exposure and other health and welfare harms, as described above, outweighs the only kind of harm Petitioners have attempted to show: monetary harm.  *See, e.g., Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 616 (D.C. Cir. 1980) ("Plainly, any possible reduction in the price of produce that might result from denying preliminary relief would be only short-term, and would never approach the value of the children's health to the nation.").  "Courts of equity may, and frequently do, go much farther both to give *and withhold relief* in furtherance of

---

[25] *See* Implementation of the 2008 National Ambient Air Quality Standards for Ozone: State Implementation Plan Requirements, 80 Fed. Reg. 12,264, 12,279/2 (Mar. 6, 2015).

18

the public interest than they are accustomed to go when only private interests are involved." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (emphasis added); *see also Maryland-Nat'l Cap. Park & Plan. Comm'n v. U.S. Postal Serv.*, 487 F.2d 1029, 1042 (D.C. Cir. 1973) ("Equitable remedies depend not only on a determination of legal rights and wrongs, but on such matters as laches, good (or bad) faith, and *most important* an appraisal of the public interest.") (emphasis added). The public harms that would flow from preventing the Federal Plan from taking effect, especially compared to the purely private financial interests of the Petitioners, favor withholding the extraordinary relief of a stay.

## IV. CONCLUSION

For these reasons, and for the reasons submitted separately by EPA in its brief, the motions for stay should be denied.

Dated:  February 27, 2023   Respectfully submitted,

/s/ Charles McPhedran
Charles McPhedran
Pa. Bar ID No. 60123
Earthjustice
1617 John F. Kennedy Blvd., Suite 2020
Philadelphia, PA 19103
(215) 717-4521
cmcphedran@earthjustice.org

Mychal Ozaeta
Cal. Bar ID No. 309851
Earthjustice

707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
(213) 766-1069
mozaeta@earthjustice.org

Zachary M. Fabish
DC Bar ID No. 986127
Sierra Club
50 F Street, NW – 8th Floor
Washington, DC 20001
(650) 388-8466
zachary.fabish@sierraclub.org

*Counsel for Intervenor-
Respondent Sierra Club*

20

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.    The foregoing response to a motion complies with the type-volume limitations of Federal Rules of Appellate Procedure 27(d)(2)(A) because it contains 4,535 words, excluding the parts excluded from length as to briefs under Federal Rule of Appellate Procedure 32(f); and with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

2.    On February 27, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system.

DATED: February 27, 2023

/s/ Charles McPhedran
Charles McPhedran