# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

### No. 22-3026
### (and consolidated case No. 22-3039)

---

### KEYSTONE-CONEMAUGH PROJECTS, LLC

*Petitioner*,

v.

### UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,

*Respondents*.

---

On Petition for Review of Final Agency Action of the
United States Environmental Protection Agency

---

### BRIEF OF INTERVENOR-RESPONDENT SIERRA CLUB

---

Charles McPhedran
Pa. Bar ID No. 60123
Earthjustice
1617 John F. Kennedy Blvd.
Suite 2020
Philadelphia, PA 19103
(215) 717-4521
cmcphedran@earthjustice.org

Zachary M. Fabish
DC Bar ID No. 986127
Sierra Club
50 F Street, NW – 8th Floor
Washington, DC 20001
(650) 388-8466
zachary.fabish@sierraclub.org

Mychal Ozaeta
Cal. Bar ID No. 309851
Earthjustice
707 Wilshire Blvd.,
Suite 4300
Los Angeles, CA 90017
(213) 766-1069
mozaeta@earthjustice.org

*Counsel for Intervenor-Respondent Sierra Club*

**March 31, 2023**

**CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF FINANCIAL INTEREST PURSUANT TO FED. R. APP. P. 26.1**

Pursuant to Fed. R. App. P. 26.1 and Third Circuit LAR 26.1, Intervenor-

Respondent Sierra Club makes the following disclosure:

1) For non-governmental corporate parties please list all parent corporations:

   **None/not applicable.**

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

   **None/not applicable.**

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

   **None/not applicable.**

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and 3) any entity not named in the caption which is an active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant:

   **None/not applicable.**

Dated: March 31, 2023          *s/ Charles McPhedran*
                               Charles McPhedran, Esq.
                               *Counsel for Intervenor-Respondent Sierra Club*

i

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF
FINANCIAL INTEREST PURSUANT TO FED. R. APP. P. 26.1......................... i

TABLE OF AUTHORITIES ......................................................................... iii

GLOSSARY.............................................................................................v

BACKGROUND .......................................................................................1

SUMMARY OF ARGUMENT ...................................................................10

ARGUMENT ..........................................................................................11

   I.   EPA Lawfully Issued the Pennsylvania RACT Federal Plan in Accordance
   with the Clean Air Act and the Order of this Court.................................11

   II.  Actual Historical Performance Demonstrates that the NOx RACT FIP Limits
   Are Reasonably Achievable........................................................16

CONCLUSION ........................................................................................25

COMBINED CERTIFICATIONS.................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Arizona ex rel. Darwin v. EPA*,
   815 F.3d 519 (9th Cir. 2016) ...................................................................12

*Bell v. Cheswick Generating Station*,
   734 F.3d 188 (3d Cir. 2013) ...................................................................14

*EME Homer City Generation L.P. v. EPA*,
   795 F.3d 118 (D.C. Cir. 2015)................................................................12

*EPA v. EME Homer City Generation, L.P.*,
   572 U.S. 489 (2014)..........................................................................11, 15

*GenOn REMA LLC v. EPA*,
   722 F.3d 513 (3d Cir. 2013) .........................................................11, 12, 13

*Navistar Int'l Transp. Corp. v. EPA*,
   941 F.2d 1339 (6th Cir. 1991) ...................................................................4

*Oklahoma v. EPA*,
   723 F.3d 1201 (10th Cir. 2013) .........................................................12, 15

*Sierra Club v. EPA*,
   972 F.3d 290 (3d Cir. 2020) ...........................................................*passim*

**Statutes**

42 U.S.C. § 7408(a) ......................................................................................3

42 U.S.C. § 7409(a) ......................................................................................3

42 U.S.C. § 7409(b) ......................................................................................3

42 U.S.C. § 7410................................................................................12, 13

42 U.S.C. § 7410(c) ............................................................................12, 15

42 U.S.C. § 7410(c)(1)........................................................................11, 15

42 U.S.C. § 7410(c)(1)(A) ........................................................................11

42 U.S.C. § 7410(c)(1)(B) ......................................................10, 11, 13

42 U.S.C. § 7410(k)(1)(A) ......................................................14

42 U.S.C. § 7410(k)(5)............................................................12

42 U.S.C. § 7502(c)(1)............................................................3, 7

42 U.S.C. § 7511c(a) ..............................................................7

**Regulations**

40 C.F.R. § 81.339 ..................................................................6

**Federal Register Notices**

57 Fed. Reg. 18,070 (Apr. 28, 1992) ....................................5, 16

57 Fed. Reg. 55,620 (Nov. 25, 1992) ....................................4

63 Fed. Reg. 57,356 (Oct. 27, 1998)......................................21

66 Fed. Reg. 43,795 (Aug. 21, 2001) ....................................20

70 Fed. Reg. 25,162 (May 12, 2005) ....................................21

73 Fed. Reg. 16,436 (Mar. 27, 2008) ....................................6

80 Fed. Reg. 65,292 (Oct. 26, 2015)......................................1, 2

81 Fed. Reg. 74,504 (Oct. 26, 2016).....................................7

83 Fed. Reg. 11,155 (Mar. 14, 2018) ....................................7

84 Fed. Reg. 20,274 (May 9, 2019) ......................................8

86 Fed. Reg. 23,054 (Apr. 30, 2021) ....................................24

87 Fed. Reg. 31,798 (May 25, 2022) ....................................15, 16

87 Fed. Reg. 50,257 (Aug. 16, 2022) ....................................11

87 Fed. Reg. 53,381 (Aug. 31, 2022) ....................................*passim*

**GLOSSARY**

| | |
|---|---|
| CAIR | Clean Air Interstate Rule |
| DEP | Department of Environmental Protection |
| EPA | Environmental Protection Agency |
| FIP | Federal implementation plan |
| MMBtu | Million British thermal unit |
| NAAQS | National Ambient Air Quality Standards |
| NOx | Oxides of Nitrogen |
| RACT | Reasonably available control technology |
| RCU | Revised Cross State Air Pollution Rule Update |
| SCR | Selective catalytic reduction |
| SIP | State implementation plan |
| TSD | Technical support document |

Respondent-Intervenor Sierra Club respectfully submits this brief in response to the briefs of Keystone-Conemaugh Projects, LLC and Homer City Generation, L.P.

## BACKGROUND

**Ground Level Ozone**

Ozone, the main component of smog, is a corrosive air pollutant that inflames the lungs, constricts breathing, and likely kills people. *See* Environmental Protection Agency ("EPA"), National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292, 65,308/3-09/1[1] (Oct. 26, 2015) (JA____-__); EPA, *Integrated Science Assessment for Ozone and Related Photochemical Oxidants*, at 2-20 to -24, Table 2-1 (Feb. 2013) (EPA-HQ-OAR-2008-0699-0405) ("Science Assessment") (JA____-__). Ozone causes and exacerbates asthma attacks, emergency room visits, hospitalizations, and other serious health harms. *See, e.g.*, EPA, *Policy Assessment for the Review of the Ozone National Ambient Air Quality Standards*, at 3-18, 3-26 to -29, 3-32 (Aug. 2014) (EPA-HQ-OAR-2008-0699-0404) ("Policy Assessment") (JA____-__); Science Assessment at 2-16 to -18, 2-20 to -24, Table 2-1 (JA____-__). Ozone-induced health problems can force people to change their ordinary activities, requiring children to stay indoors and forcing people to take

---

[1] Column references for Federal Register page citations included, where applicable, in "/column number" format.

medication and miss work or school.  *See, e.g.*, Policy Assessment at 4-12 (JA____).

Ozone can harm healthy adults, but others are even more vulnerable.  *See* 80 Fed. Reg. at 65,310/1-3 (JA____).  Because their respiratory tracts are not fully developed, children are especially vulnerable to ozone pollution, particularly when they have elevated respiratory rates, as when playing outdoors.  *See, e.g.*, Policy Assessment at 3-81 to -82 (JA____-__).  People with lung disease and the elderly also have heightened vulnerability.  *See* 80 Fed. Reg. at 65,310/3 (JA____).  People with asthma suffer more severe impacts from ozone exposure than healthy individuals do and are more vulnerable at lower levels of exposure.  *Id.* at 65,311/1 n.37, 65,322/3 (JA____-__).

Ozone also damages vegetation and forested ecosystems, causing or contributing to widespread stunting of plant growth, tree deaths, reduced carbon storage, and reduced crop yields.  Policy Assessment at 5-2 to -3 (JA____-__); Science Assessment at 9-1 (JA____).  The damage includes tree-growth losses reaching 30-50% in some areas, and widespread visible leaf injury, including 25-37% of sites studied in just one state.  Policy Assessment at 5-13 (JA____); Science Assessment at 9-40 (JA____).  By harming vegetation, ozone can also damage entire ecosystems, leading to ecological and economic losses.  80 Fed. Reg. at 65,370/1-2, 65,377/3 (JA____-__).

**National Standards and Reasonably Available Control Technology**

Under the Clean Air Act, EPA is charged with setting National Ambient Air Quality Standards ("NAAQS" or "National Standards") for air pollutants such as ozone in order to protect the public health. *See Sierra Club v. EPA*, 972 F.3d 290, 293 n.3 (3d Cir. 2020) (citing 42 U.S.C. §§ 7408(a), 7409(a)-(b)). Ground-level ozone is not emitted directly into the air, but is created by chemical reactions between oxides of nitrogen ("NOx") and volatile organic compounds emitted as air pollution from sources such as power plants and industrial boilers. *Id.* at 293-94.[2]

The setting of a National Standard triggers certain requirements on both EPA and the states to ensure that the new standard is implemented, and that the public health is protected. EPA must identify and designate those parts of the country that are failing to attain the National Standard, and states with such nonattainment areas must develop plans that include requirements for "reductions in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology," or "RACT." 42 U.S.C. § 7502(c)(1).

RACT is a technology-forcing standard designed to induce and require improvements in control technology and reductions in pollutant emissions. *See*

---

[2] *See* EPA, "Ground-level Ozone Basics," https://www.epa.gov/ground-level-ozone-pollution/ground-level-ozone-basics#formation (last visited Mar. 29, 2023).

*Sierra Club* at 295 ("RACT is not designed to rubber-stamp existing control methods. It is a technology-forcing mechanism."). Indeed, EPA has long maintained that RACT should represent "the toughest controls considering technological and economic feasibility that can be applied to a specific situation" and that "[a]nything less than this is by definition less than RACT." *Id*. at 294 (internal quotations omitted).[3]

RACT is defined as "the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility." *Id*. (internal quotations omitted).[4] The RACT definition comprises two parts: technological feasibility and economic feasibility. *Id*. at 295.

As to technological feasibility, EPA has explained that "[t]he technological feasibility of applying an emission reduction method to a particular source should

_____

[3] Memorandum from Roger Strelow, Assistant Admin. for Air and Waste Mgmt., U.S. EPA, to Regional Admin., Regions I - X, at 2 (Dec. 9, 1976) ("Strelow Memo"), https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/197612 09_strelow_ract.pdf (last visited Mar. 29, 2023).

[4] EPA, State Implementation Plans; Nitrogen Oxides Supplement to the General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990, 57 Fed. Reg. 55,620, 55,624/3 (Nov. 25, 1992) (JA____-__); *see also Navistar Int'l Transp. Corp. v. EPA*, 941 F.2d 1339, 1343 (6th Cir. 1991) ("Since 1976, the EPA has interpreted reasonably available control technology to be the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility") (internal quotations omitted).

consider the source's process and operating procedures, raw materials, physical plant layout, and any other environmental impacts such as water pollution, waste disposal, and energy requirements." *Id*. (internal quotations omitted).[5]

As to economic feasibility, EPA has explained that it "considers the cost of reducing emissions and the difference in costs between the particular source and other similar sources that have implemented emission reduction." *Id*. (internal quotations omitted).[6] Specifically, economic feasibility for RACT purposes "is largely determined by evidence that other sources in a source category have in fact applied the control technology in question."[7]

Further, EPA has explained that RACT is not intended to enshrine existing control methods, but rather is technology-forcing. *Id*.[8] Thus, "[i]n determining RACT for an individual source or group of sources, the control agency, using the available guidance, should select the best available controls, deviating from those controls only where local conditions are such that they cannot be applied there and imposing even tougher controls where conditions allow."[9]

---

[5] EPA, State Implementation Plans; General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990; Supplemental, 57 Fed. Reg. 18,070, 18,073 (Apr. 28, 1992) (JA_____-__).
[6] *Id.*
[7] *Id*.
[8] Strelow Memo at 2.
[9] *Id.*

**Pennsylvania's Failure to Attain the Ozone National Standard**

In 2008, EPA revised the 1997 ozone National Standard to 75 parts per billion with an 8-hour averaging period. *Id*. at 294.[10]  In 2012, EPA finalized air quality designations, including nonattainment designations, with reference to this 2008 ozone National Standard, adding to prior nonattainment designations in Pennsylvania under the preexisting 1997 National Standard.

Seventeen counties centered around Philadelphia and Pittsburgh are designated in nonattainment of the 2008 ozone National Standard. *Id*.[11]  These seventeen counties contain over 8.1 million residents, or roughly two-thirds of Pennsylvania's total population.[12]  Moreover, millions of Pennsylvania residents are particularly susceptible to ozone pollution, including nearly 2.5 million seniors and 2.6 million children, and 1.3 million asthma sufferers.[13] Because of these nonattainment designations, and because Pennsylvania is part of the Ozone

---

[10] EPA, National Ambient Air Quality Standards for Ozone, 73 Fed. Reg. 16,436 (Mar. 27, 2008) (JA_____).

[11] These seventeen counties are Allegheny, Armstrong, Beaver, Berks, Bucks, Butler, Carbon, Chester, Delaware, Fayette, Lancaster, Lehigh, Montgomery, Northampton, Philadelphia, Washington, and Westmoreland.  *See* Pa. Dep't of Env't Prot., "Attainment Status by Principal Pollutants", http://www.dep.pa.gov/Business/Air/BAQ/Regulations/Pages/Attainment-Status.aspx (last visited Mar. 29, 2023); *see also* 40 C.F.R. § 81.339.

[12] *See* U.S. Census Bureau, "Explore Census Data," https://data.census.gov/cedsci/ (last visited Mar. 29, 2023).

[13] *See* Am. Lung Ass'n, State of the Air 2022, "Report Card: Pennsylvania," https://www.lung.org/our-initiatives/healthy-air/sota/city-rankings/states/pennsylvania/ (last visited Mar. 29, 2023).

Transport Region, Pennsylvania was required to prepare a RACT revision to its plan for major stationary sources of the ozone precursor pollutants NOx and volatile organic compounds in Pennsylvania. *Id*. at n.10 (citing 42 U.S.C. §§ 7511c(a), 7502(c)(1)).

Electric power plants are a significant source of ozone-forming NOx pollution, and reductions in their NOx emissions lead to important improvements in air quality. *Id*. at 294.[14] Accordingly, properly implemented RACT standards in the electrical generating sector are critical to addressing Pennsylvania's ozone attainment problems and improving public health.

On May 16, 2016, Pennsylvania submitted a proposed revision to its preexisting RACT rules under the 2008 ozone National Standard ("RACT Submittal" or "RACT II Rule"). *Id*. at 296.[15] In relevant part, the RACT Submittal proposed NOx emission limits for coal-fired power plants equipped with

---

[14] *See, e.g.*, EPA, Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 Fed. Reg. 74,504, 74,514/2 (Oct. 26, 2016) (JA____-__) (EPA observed that "studies have found that [electric generating unit] NOx emission reductions, particularly, can be effective in reducing ozone pollution as quantified by the form of the 2008 ozone standard, 8-hour peak concentrations" and that "studies have found that [electric generating unit] emission reductions can be effective in reducing the upper end of the cumulative ozone distribution in the summer on a regional scale.").

[15] *See* EPA, Approval and Promulgation of Air Quality Implementation Plans; Pennsylvania; Regulatory Amendments Addressing Reasonably Available Control Technology Requirements Under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards, 83 Fed. Reg. 11,155 (Mar. 14, 2018) (JA____).

selective catalytic reduction ("SCR"). *Id*. at 295. Specifically, for such boilers, while operating with an inlet temperature greater or equal to 600 degrees Fahrenheit, such units were required to achieve an emission limit of 0.12 pounds of NOx per million British thermal units ("MMBtu"). *Id*. at 296. Under the RACT Submittal, the 0.12 lb/MMBtu limit would not apply when SCR-equipped boilers were operating with an inlet temperature of below 600 degrees Fahrenheit. *Id*. at 299.

On May 9, 2019, EPA issued a final approval for most parts—including the emission limits for SCR-equipped coal-fired power plants—of Pennsylvania's RACT Submittal. *See* EPA, Approval and Promulgation of Air Quality Implementation Plans; Pennsylvania; Regulatory Amendments Addressing Reasonably Available Control Technology Requirements Under the 1997 and 2008 8-Hour Ozone National Ambient Air Quality Standards, 84 Fed. Reg. 20,274 (May 9, 2019) (JA____).

After Sierra Club sought judicial review of EPA's action, this Court vacated and remanded EPA's approval because it found that Pennsylvania's RACT II Rule was "neither supported by adequate facts nor by reasoning found in the administrative record." *Sierra Club* at 293. This Court also found that Pennsylvania's attempted use of a temperature threshold to establish tiered emission limits was a "gaping loophole" in the rule. *Id*. at 309. As a result, this

8

Court directed EPA to "either approve a revised, compliant SIP within two years or formulate a new federal implementation plan." *Id.*

In response to this Court's order, EPA promulgated the Federal Plan, which establishes NOx emission limits for nine units across four facilities in Pennsylvania to address the Clean Air Act's RACT requirements for the 1997 and 2008 ozone National Standards. EPA, Federal Implementation Plan Addressing Reasonably Available Control Technology Requirements for Certain Sources in Pennsylvania, 87 Fed. Reg. 53,381 (Aug. 31, 2022) ("Federal Plan") (JA____). Specifically, EPA established weighted facility-wide 30-day emission limits for four facilities in Pennsylvania: Conemaugh, Homer City, Keystone, and Montour. *Id.* at 53,399 (JA____). EPA also established unit-specific daily NOx mass emission limits to complement the weighted 30-day emission limits. *Id*. at 53,401 (JA____). Finally, EPA established recordkeeping and reporting requirements that require each facility to biannually submit a variety of information including daily operating time, daily NOx mass emissions, heat input, and facility-wide thirty-day rolling average emission rates, amongst other information. *Id*. at 53,404 (JA____).

**Petitions for Review**

Keystone-Conemaugh Projects, LLC ("Key-Con") and Homer City Generation, LLC ("Homer City") have petitioned for review of the Federal Plan. Docket No. 22-3026, Doc. 1-1; Docket No. 22-3039, Doc. 1-1. After consolidating

the petitions for review in this case, the Court granted motions to intervene filed by Sierra Club, Montour, LLC, and the Pennsylvania Department of Environmental Protection ("DEP"). Docket No. 22-3026 (consolidated), Docs. 23, 24.

## SUMMARY OF ARGUMENT

The Court should uphold EPA's promulgation of the Federal Plan because Petitioners' challenges to the rule are meritless. Although Petitioners claim that EPA usurped Pennsylvania's role under the Clean Air Act, the Agency lawfully issued the Federal Plan in accordance with the Act, which requires EPA to promulgate a federal implementation plan ("FIP") within two years of disapproving a state implementation plan ("SIP") submission in whole or in part. 42 U.S.C. § 7410(c)(1)(B). Moreover, EPA's action was in response to a previous order of this Court requiring the Agency to either approve a revised, compliant SIP or promulgate a FIP by August 27, 2022. *Sierra Club* at 309.

Petitioners' claims that EPA's issuance of the Federal Plan was not in accordance with the law and RACT similarly fail. The rule establishes NOx emission rates that are supported by factual data, and that are consistent with the technologically and economically achievable emission rates demonstrated by Pennsylvania's SCR-equipped coal fleet.

10

**ARGUMENT**

## I. EPA Lawfully Issued the Pennsylvania RACT Federal Plan in Accordance with the Clean Air Act and the Order of this Court

Under the Clean Air Act, states develop plans to implement statutory requirements with federal oversight. The Act requires EPA to promulgate a FIP within two years after either (a) finding that a state has either failed to submit a required plan or that a state plan submission does not satisfy minimum statutory criteria, or (b) disapproving a state plan in whole or in part. 42 U.S.C. § 7410(c)(1)(A), (B). Here, EPA's imposition of a federal plan followed its disapproval of the Pennsylvania state plan for NOx RACT. Federal Plan (JA____-__); EPA, Air Plan Partial Disapproval; Commonwealth of Pennsylvania; Reasonably Available Control Technology Regulations for the 1997 and 2008 Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 50,257 (Aug. 16, 2022) (JA____-__). Moreover, EPA's action also responded to an Order of this Court that required a strong approach to the RACT program, and that mirrored the FIP requirement under the Clean Air Act: "On remand, the agency must either approve a revised, compliant SIP within two years or formulate a new federal implementation plan." *Sierra Club* at 309 (citing 42 U.S.C. § 7410(c)(1) and *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 498 (2014)).

The relationship between federal and state action under the Clean Air Act is sometimes described as "cooperative federalism." *GenOn REMA LLC v. EPA*, 722

F.3d 513, 516 (3d Cir. 2013).  Under this approach, states adopt plans to

implement the Clean Air Act and submit them to EPA; EPA must ensure that state

plans meet federal requirements.  42 U.S.C. § 7410.  As this Court has described

cooperative federalism and 42 U.S.C. § 7410:

> If the EPA finds that a SIP is inadequate to attain or maintain a
> NAAQS or otherwise does not comply with the Clean Air Act, the
> EPA issues a "SIP call" requiring the state to submit a revised SIP to
> correct the inadequacies.  *Id.* § 7410(k)(5). The EPA may also
> promulgate a Federal Implementation Plan ("FIP") to establish direct
> federal controls on sources of air pollution if the EPA disapproves a
> SIP in whole or in part, or finds that a state has failed to submit either
> a SIP or SIP revision.  *Id.* § 7410(c).

*GenOn REMA LLC v. EPA*, 722 F.3d at 516.  Thus, under the Act as confirmed by

this Court, EPA action to promulgate a FIP is expected following disapproval of a

SIP.

Other circuit courts have consistently upheld EPA's authority under the

Clean Air Act to issue federal plans.  The Tenth Circuit upheld EPA's authority to

issue a federal plan for Oklahoma regarding another Clean Air Act technology

standard (best available retrofit technology, or BART).  *Oklahoma v. EPA*, 723

F.3d 1201 (10th Cir. 2013).  The Ninth Circuit upheld EPA's rejection of a state

plan and issuance of a federal plan for BART.  *Arizona ex rel. Darwin v. EPA*, 815

F.3d 519 (9th Cir. 2016).  The D.C. Circuit held that EPA had authority to issue

federal plans for 27 states regarding transported air pollution.  *EME Homer City*

*Generation L.P. v. EPA*, 795 F.3d 118 (D.C. Cir. 2015).

Ignoring this precedent, Key-Con refers to EPA's action as "usurp[ing]" Pennsylvania DEP's role.  Key-Con, Brief, Docket No. 22-3026 (consolidated), Doc. 28-1, at 26 ("Key-Con Br.").  To "usurp" is to seize or to hold in possession by force or without right.[16]  Unfortunately for Key-Con, EPA's action was *required* by the Clean Air Act following disapproval of the state plan, 42 U.S.C. § 7410, and is in accordance with Third Circuit precedent (*GenOn REMA LLC*). Indeed, Key-Con acknowledges EPA's authority even as it claims usurpation, writing that "EPA is authorized to usurp the states' role and promulgate a FIP in only two circumstances."  Key-Con Br. at 26.  One of these circumstances is after disapproval of a state plan under 42 U.S.C. § 7410(c)(1)(B), as EPA did here; thus, EPA's action is authorized by statute and is not usurpation.

Similarly, arguments by Intervenor Pennsylvania DEP are only persuasive if one manages to ignore that the Clean Air Act establishes EPA's role in reviewing state plans and EPA's authority to issue federal plans.  DEP brazenly—and incorrectly—claims that "only the Commonwealth of Pennsylvania" has "the authority to make choices regarding the selection of air pollution control strategies" in its SIP.  Pennsylvania DEP, Brief, Docket No. 22-3026 (consolidated), Doc. 27-1, at 1 ("DEP Br.").  Since the provisions of the Clean Air

---

[16] Merriam-Webster, https://www.merriam-webster.com/dictionary/usurp (last visited Mar. 29, 2023).

Act cited above provide for EPA action on state plan submittals, and provide for EPA to issue federal plans, this statement is false. In fact, DEP concedes as much, citing authority that federal leadership is "essential" to accomplish the goals of the Clean Air Act. *Id.* at 8, citing *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013). DEP later also concedes that EPA may issue a federal plan where a state fails to meet its Clean Air Act obligations. *Id.* at 10.

Under *Sierra Club*, frequently cited in Petitioners' briefs, RACT "is a technology-forcing standard designed to induce improvements and reductions in pollution for existing sources." *Sierra Club* at 294. Here, EPA has established NOx emission rates that are supported by factual data and are consistent with the technologically and economically achievable emission rates demonstrated by Pennsylvania's SCR-equipped coal fleet. Federal Plan at 53,399 (JA____). That is, EPA has imposed a federal plan that implements the requirements of RACT under the Act and which is therefore consistent with the holding in *Sierra Club*.

Petitioner Key-Con criticizes EPA for proceeding with a federal plan even as Pennsylvania DEP prepared its own SIP. Key-Con Br. at 25-31. However, EPA's duty to create a FIP arises if EPA "finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A) of this section"; or 2) "disapproves a State implementation plan submission in whole or in

part." *Oklahoma v. EPA*, 723 F.3d at 1204 (internal quotations omitted) (citing 42 U.S.C. § 7410(c)(1)). Further, "EPA is not obliged to wait two years or postpone its action even a single day: The Act empowers the Agency to promulgate a FIP 'at any time' within the two-year limit." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 509 (2014) (citing 42 U.S.C. § 7410(c)).

Pennsylvania DEP claims, without statutory authority, that EPA is powerless to issue a federal plan after disapproving an inadequate state plan so long as the state quickly submits *another* plan in the meantime. DEP Br. at 19. Thus, DEP posits a world in which a state could intervene on behalf of air pollution sources by offering serial plans so as to prevent the Clean Air Act from ever being properly implemented. By contrast, the cases discussed above affirm EPA's power to issue FIPs.

Here, EPA faced a court order requiring EPA to "either approve a revised, compliant SIP within two years or formulate a new Federal implementation plan." *See* Federal Plan at 53,381/3 (JA____) (citing *Sierra Club* at 309). As EPA wrote in the proposed rule: "The FIP is being proposed to ensure that EPA can, if necessary, meet a court-ordered deadline requiring EPA to approve an amended State Implementation Plan (SIP) or issue a FIP by August 27, 2022." EPA, Federal Implementation Plan Addressing Reasonably Available Control Technology Requirements for Certain Sources in Pennsylvania, 87 Fed. Reg. 31,798 (May 25,

2022) (JA____).  Thus, EPA acted in accordance with the Clean Air Act and precedent in issuing the proposed and final federal plan, and complaints regarding the timeline of EPA's action are misplaced.

## II. Actual Historical Performance Demonstrates that the NOx RACT FIP Limits Are Reasonably Achievable

RACT is "the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility." *Sierra Club* at 294 (internal quotations omitted).  Critically,

> **Economic feasibility rests very little on the ability of a particular source to "afford" to reduce emissions to the level of similar sources.** Less efficient sources would be rewarded by having to bear lower emission reduction costs if affordability were given high consideration. **Rather, economic feasibility . . . is largely determined by evidence that other sources in a source category have in fact applied the control technology in question.**

*Id.* at 295 (internal quotations omitted) (emphasis added); 57 Fed. Reg. at 18,074 (JA____).

Here, EPA developed the Federal Plan NOx limits by determining from past performance what NOx emission rates the covered coal-fired generating units had achieved and could achieve when their SCR controls were well-operated.  87 Fed. Reg. at 31,805-07 (JA____-__); EPA, *Technical Support Document for Federal Implementation Plan Addressing Reasonably Available Control Technology Requirements for Certain Sources in Pennsylvania*, at 10-15 (May 6, 2022) (EPA-

R03-OAR-2022-0347-0059) ("TSD") (JA____-__).  Specifically, EPA first

reviewed past plant performance data "to determine what the capacity (hourly

gross load) threshold is for running the SCR" at each unit—i.e., the level of unit

operation at which the SCR system could be employed.  TSD at 11 (JA____).

Then, armed with that threshold at which each unit could run its SCR, EPA looked

at the historical performance in the context of whether or not the SCR *could* have

been operated, to determine what standard of SCR performance was reasonable for

that unit.  *Id.* at 12-13 (JA____-__).  This involved assessing on the one hand the

NOx emission rate achieved when the SCR was operated and, on the other, the

NOx emission rate achieved when SCR was not operated.  *Id.* at 13 (JA____).  In

generating average NOx emission rates for SCR operation, EPA looked

specifically at the third-best (rather than first-best) ozone season performance from

2003 to 2021 for most units[17] to "account[] for degradation of control equipment

over time," and looked at the times during ozone seasons 2003-2021 when SCR

was *not* employed to develop an average "SCR-off" emission rate.  *Id.* at 13

(JA____).  For each unit, EPA then created an average of the SCR-off emission

rate and the average SCR-on emission rate, weighted by the amount of time the

---

[17] EPA only looked at 2015-2021 for Conemaugh, as it was not equipped with SCR
in prior ozone seasons.  TSD at 13 n.10 (JA____).

unit spent below or above, respectively, the threshold for SCR operation, TSD at 13, with a straightforward equation:

*(SCR-on weight \* SCR-on mean rate) +*
*(SCR off weight \* SCR off mean rate)* = emissions limit in lb/MMBtu.

Federal Plan at 53,384/3 (JA____).  Finally, in response to comments from Homer City, EPA then averaged the resulting emission rates across units at each facility to develop a single plantwide emission limit for each facility for the FIP.  *Id.* at 53,388/2 (JA____).  The resulting limits are consistent with RACT; they are demonstrably technologically and economically achievable as they are consistent with past emission rates actually achieved by the SCR technology the plants are equipped with.  *See Sierra Club* at 300 (noting that it is "[e]ven more disquieting" to "ignore[]" historical data showing that the plants "have actually achieved much greater reductions" in the past).

Homer City and Key-Con's arguments to the contrary fail.  For example, Homer City claims that EPA's use of weighted averages is somehow inconsistent with "source-specific" RACT.  Homer City, Brief, Docket No. 22-3026 (consolidated), Doc. 30, at 30 ("Homer City Br.").  But RACT does not preclude EPA from considering a facility's average performance in assessing a particular unit within that facility.  *Sierra Club* at 295 ("Economic feasibility rests very little on the ability of a particular source to 'afford' to reduce emissions to the level of similar sources.").  Moreover, as detailed above, the weighted averages were

18

derived from *unit specific* historical operations data. Finally, the use of facility-wide averaging makes it *easier* for sources like Homer City and Key-Con to comply with the RACT FIP than if EPA had set unit-specific NOx emission rate limits, not harder.

Similarly unavailing is Homer City and Key-Con's complaint that it was arbitrary and capricious for EPA to look at ozone season NOx emissions in developing the RACT FIP. *See* Homer City Br. at 31; Key-Con Br. at 41. EPA properly regarded ozone season emission rates, as it was only during ozone season that the Pennsylvania coal-fired generating units in question were subject to regulatory pressure requiring them to operate their SCR effectively, and thus such data is "indicative of what these units can achieve" when they operate their controls. Federal Plan at 53,395/2 (JA____). This is demonstrated by comparing historical ozone-season NOx emission rates with historical ozone-season regulatory requirements. For example, before 2003, the Pennsylvania coal fleet faced very little regulatory pressure to control NOx emissions and emission rates were, as a result, very high, as the emission rates from the example plants from 2001-2019 in Figure 1 below show.

*Figure 1*[18]



However, once an EPA regulation known as the "NOx SIP Call" went into effect

in 2003,[19] for a brief period ozone season NOx allowance prices were relatively

high, reaching a peak of more than $3,000 per ton in 2005, before declining by

ninety-nine percent by 2010.  As a result, for a few years high NOx allowance

prices incentivized SCR operation by the plants, resulting in low NOx emission

---

[18] *See* Sierra Club, *Comments on EPA's Proposed Federal Implementation Plan Addressing Reasonably Available Control Technology Requirements for Certain Sources in Pennsylvania*, at 6 (July 11, 2022) ("Sierra Club Comments") (EPA-R03-OAR-2022-0347-0077).

[19] *See* EPA, Approval and Promulgation of Air Quality Implementation Plans; Pennsylvania; Nitrogen Oxides Trading Program, 66 Fed. Reg. 43,795 (Aug. 21, 2001) ("establish[ing] and requir[ing] a [NOx] allowance trading program for large electric generating and industrial units beginning in 2003" in order to "address[] the requirements of the NOx SIP Call") (JA____).

rates; but when those allowance prices shrank to trivial levels in 2010, that

pressure to operate SCR evaporated, and emission rates went back up to levels

more consistent with the prior, uncontrolled operation.

*Figure 2: NOx Allowance Prices from Argus Air Daily*[20]

| Date | Annual NOx Allowance Cost (est $) | Seasonal NOx Allowance Cost (est $) | Combined Annual and Seasonal Cost (est $) | Program |
|---|---|---|---|---|
| 4/28/2005 | 0 | 3175 | 3175 | NOx SIP call |
| 4/28/2006 | 0 | 2312 | 2312 | NOx SIP call |
| 4/30/2007 | 0 | 983 | 983 | NOx SIP call |
| 4/30/2008 | 0 | 775 | 775 | NOx SIP call |
| 4/30/2009 | 425 | 1232 | 1657 | CAIR |
| 4/30/2010 | 420 | 33 | 453 | CAIR |
| 4/30/2011 | 150 | 20 | 170 | CAIR |
| 4/30/2012 | 35 | 8 | 43 | CAIR |
| 4/30/2013 | 40 | 18 | 58 | CAIR |
| 4/30/2014 | 52 | 22 | 74 | CAIR |
| 3/31/2015 | 125 | 125 | 250 | CSAPR |

[20] Sierra Club Comments at 7. *See also* EPA, Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reduction Regional Transport of Ozone, 63 Fed. Reg. 57,356, 57,366/1 (Oct. 27, 1998) ("NOx SIP Call") (setting an "implementation date of May 1, 2003" for states including Pennsylvania) (JA____-__); EPA, Rule To Reduce Interstate Transport of Fine Particulate Matter and Ozone (Clean Air Interstate Rule); Revisions to Acid Rain Program; Revisions to the NOx SIP Call, 70 Fed. Reg. 25,162 (May 12, 2005) ("CAIR") (JA____).

Outside of ozone season—and indeed, outside of ozone seasons with regulatory pressure to operate SCR controls—emission rates in which SCR was bypassed are not indicative of RACT; they are instead indicative of what emission rates would be *absent* the reasonably available SCR controls Homer City and Key-Con have already installed. *See Sierra Club* at 301 (faulting reliance on emission rates "achieved *voluntarily*" that were "[a]bsent any regulatory pressure whatsoever" in setting RACT limits) (emphasis in original).[21]

Nor are Homer City's arguments that ozone season rates cannot be achieved during the rest of the year availing or particularly credible. Homer City Br. at 34. As EPA notes, other sources within the same source category as Homer City and Key-Con have demonstrated the ability to achieve low NOx emission rates year-round:

> **There are numerous coal-fired EGUs operating in the [Ozone Transport Region] that operate SCR controls on an annual basis**. Additionally, **there are coal-fired EGUs operating outside the OTR subject to other regulations that mandate SCR controls be operated throughout the year** as well. Like the four Pennsylvania facilities addressed in this notice, many of these other coal-fired EGUs were built in the same era (1960s and 1970s) and then later retrofitted with SCRs in response to the EPA interstate transport

---

[21] Notably, Homer City admits that at least some of the Homer City plant can comply with the Federal Plan. *Compare* Homer City Br. at 42 n.7 (according to Homer City analysis, "Unit 3 could comply") *with Sierra Club* at 294 ("Economic feasibility rests very little on the ability of a particular source to 'afford' to reduce emissions to the level of similar sources. . . . Rather, economic feasibility . . . is largely determined by evidence that other sources in a source category have in fact applied the control technology in question.").

> requirements for ozone season NOx emissions, which began in 2003.
> So, while EPA has applied RACT on a case-by-case, source-specific
> basis, **EPA cannot ignore the fact that there are many coal-fired
> EGUs, outside of Pennsylvania, that can, and do, operate their
> SCR controls year-round with NOx emission limits similar to the
> final limits determined in this notice for the purposes of NOx
> RACT** . . . .

Federal Plan at 53,395/3 (emphasis added). Indeed, as Sierra Club pointed out in comments on EPA's proposed disapproval of the Pennsylvania SIP, Pennsylvania plants have themselves demonstrated the ability to achieve low NOx emission rates year-round: Keystone achieved an annual average of 0.074 and 0.086 lbs/MMbtu in 2009 and 2010, respectively—a rate quite similar to the Federal Plan's emission limits. Sierra Club, *Comments on Air Plan Partial Disapproval*, at 8, Fig. 2 (Oct. 15, 2021) (EPA-R03-OAR-2017-0290-0105) (JA____-__).

Likewise failing are Homer City and Key-Con's arguments that EPA was arbitrary and capricious in looking at third-best ozone season performance data in evaluating what Pennsylvania coal units could achieve. As a threshold matter, using third-best ozone season performance as an input in calculating RACT limits for the coal units results in *looser* limits and an easier path to compliance. *See* Federal Plan at 53,395/1 ("EPA disagrees that we should have used the best ozone season instead of the third-best" in part because "[u]se of the third-best year avoids biasing the limit with uncharacteristically low emitting ozone seasons, or under uncharacteristically optimal operating conditions.") (JA____). Use of source-

specific third-best performance data, as EPA explains, also incorporates the potential that "parts of the overall SCR system, such as the reagent injection system, may . . . have deteriorated in performance," and thus may not be as effective as when the entire system was newly-installed. *Id.* at 53,391 (JA____). Third-best ozone season data was similarly employed by EPA in developing NOx emission allowances in the Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS (the "Revised CSAPR Update," or "RCU"). *See* TSD at 13 (JA____); EPA, Revised CSAPR Update, 86 Fed. Reg. 23,054, 23,088 (Apr. 30, 2021) (JA____-__). EPA's use of such data was neither arbitrary nor capricious.[22]

Finally, both Homer City and Key-Con claim that the RACT FIP NOx emission limits arbitrarily and capriciously fail to incorporate "cycling" changes in how they have chosen to dispatch their units over time. Homer City Br. at 31; Key-Con Br. at 42. However, these arguments also fail. EPA specifically used the 2011 to 2021 time period, and not the full 2003 to 2021 dataset, when calculating the SCR-on and SCR-off weights because the more recent years are more

---

[22] Homer City also claims it is arbitrary and capricious for EPA to use the second-best ozone season for Conemaugh. Homer City Br. at 38. While use of Homer City's second-best ozone season would likely result in *more* stringent NOx emission limits for Homer City's units, EPA's election to use the second-best ozone season for Conemaugh but not Homer City is neither arbitrary, capricious nor particularly mysterious; as EPA pointed out, "Conemaugh's SCR was only installed in late 2014 and EPA therefore doesn't have the same volume of operating data as for the other sources." Federal Plan at 53,391/3 n.31 (JA____).

"representative of the time period when the units began to exhibit a greater cycling pattern." TSD at 13 (JA____). Similarly, the NOx emission rate limits are set on a 30-day average, which allows brief spikes in emissions due to cycling to be averaged out for compliance purposes. *See also* Federal Plan 53,396/1-2 (JA____). Moreover, EPA noted that *very recent* performance of the units in question indicates that they can comply with the emission limits notwithstanding changes in their dispatch that have occurred in recent years:

> [D]ata for some of these units from May through June of the 2022 ozone season **generally indicate SCR operating patterns (and, as a result, NOx emissions) that match or are among their best in the recent data record**. EPA believes this is due, at least in part, to the market prices of NOx allowances needed for compliance with the RCU during this period, which were reported to range between $20,000 and $40,000 per ton.

*Id.* at 53,390/1 (emphasis added). Thus, as confirmed by 2022 data, Homer City and Key-Con's arguments fail, and they have not carried their burden in demonstrating that the Federal Plan should be vacated.

## CONCLUSION

For these reasons, the Petitions for Review should be denied.

Dated: March 31, 2023                    Respectfully submitted,


                                         /s/ Charles McPhedran
                                         Charles McPhedran
                                         Pa. Bar ID No. 60123
                                         Earthjustice
                                         1617 John F. Kennedy Blvd., Suite 2020

25

Philadelphia, PA 19103
(215) 717-4521
cmcphedran@earthjustice.org

Mychal Ozaeta
Cal. Bar ID No. 309851
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
(213) 766-1069
mozaeta@earthjustice.org

Zachary M. Fabish
DC Bar ID No. 986127
Sierra Club
50 F Street, NW – 8th Floor
Washington, DC 20001
(650) 388-8466
zachary.fabish@sierraclub.org

*Counsel for Intervenor-*
*Respondent Sierra Club*

# COMBINED CERTIFICATIONS

I hereby certify that:

1.   The foregoing brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(g)(1) and 32(a)(7)(B)(i) because it contains 5,729 words, excluding the parts excluded from length as to briefs under Federal Rule of Appellate Procedure 32(f); and with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word Version 2302 in Times New Roman 14-point font.

2.   In accordance with Third Circuit Local Appellate Rule 28.3(d), counsel for Intervenor-Respondent Sierra Club are members of the bar of the United States Court of Appeals for the Third Circuit.

3.   Pursuant to the Court's order of December 13, 2022, no paper copy of this proof brief will be filed with the Court.

4.   Pursuant to Third Circuit Local Appellate Rule 31.1(c), a virus detection program was run on the electronic version of the brief using Microsoft Defender Antivirus Version 1.383.907.0, and no virus was detected.

5.   On March 31, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system.

DATED: March 31, 2023

/s/ Charles McPhedran
Charles McPhedran